Argued and submitted August 18, reversed and remanded December 13, 2006

STATE OF OREGON,
*Respondent,*

*v.*

DOUGLAS EUGENE BROWN,
*Appellant.*

0200303CR; A125677

149 P3d 294

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. With him on the brief were Peter Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Ortega and Rosenblum, Judges.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Defendant appeals a judgment of conviction for delivery of a controlled substance. *Former* ORS 475.992(1)(b) (2001), *renumbered as* ORS 475.840(1)(b) (2005). He assigns error to the trial court's denial of his motion to suppress evidence, asserting that the evidence was obtained as the result of an unlawful stop and an unlawful arrest following the stop. We agree with defendant that the evidence in question derived from an unlawful stop. Because that conclusion provides defendant with complete relief, we reverse and remand without reaching the question whether the arrest was unlawful as well.

■■ In reviewing the trial court's ruling on a motion to suppress, we are bound by the historical facts underlying the ruling if those facts are supported by any evidence. *State v. Boone*, 327 Or 307, 309, 959 P2d 76 (1998). Whether the facts justify the court's decision is a legal question that we review for errors of law. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005).

The trial court found the following facts, and they are supported by evidence. At around 9:30 p.m. on December 5, 2002, Officer Miller noticed defendant sitting in a parked car on a quiet street in The Dalles. Miller radioed dispatch with the car's license plate number and learned that the car was registered to defendant. Overhearing that exchange, another officer on patrol that night, Kienlen, notified Miller that he wanted to talk to defendant; Kienlen had received information from a third officer, Detective Nelson, who had heard from a "credible source" (otherwise unidentified), that defendant might be selling methamphetamine and marijuana from his car.

Based on Kienlen's request, Miller turned around and parked behind defendant's car. He turned on his amber lights (but not the overhead lights used for a traffic stop), approached defendant, and asked him, "Is everything alright?" Defendant responded that everything was fine and explained that he was just sitting in his car eating. Miller then asked defendant, "Could I check your ID? And I'll get out of here and leave you alone." Defendant agreed and

handed Miller his driver's license. Miller then called dispatch and requested a warrant check. Before receiving a response from dispatch, Miller walked back to defendant's car and returned his license.

As Miller was returning to defendant's car, Kienlen pulled up and parked behind Miller's patrol car. With Miller on the passenger's side of defendant's car and Kienlen on the driver's side, Kienlen asked defendant what he was doing and told him that he thought it was odd that defendant was parked on that street at that time of night. Defendant replied that he was just trying to eat and was parked there because he did not want to be bothered. Kienlen repeated his statement that he found defendant's behavior to be odd. Defendant then asked whether he had done anything wrong and if he was free to leave. As described by the trial court in its findings,

> "Officer Kienlen responded, no, [defendant] had done nothing wrong and he was free to go; and that the reason he was talking to [defendant] was because another officer had told him that [defendant] dealt controlled substances out of his car, and that Officer Kienlen would like to search [defendant's] car just to see if that was true or not true. * * * [Defendant] said, 'No, [you] can't search the car.' And there was more conversation. Again, Officer Kienlen asked to search [defendant's] car. Again, [defendant] said no."

As Kienlen was talking to defendant, he shined his flashlight into the car and noticed a soft drink can in defendant's car. The can was dented in a way that Kienlen knew made the can usable for smoking marijuana. Kienlen asked defendant to hand him the can; defendant said, "Sure," and did so. Kienlen saw that the can had several small holes surrounded by what he recognized as burnt marijuana residue.

Kienlen knew that possession of less than one ounce of marijuana is a violation, for which an officer may not arrest a person. *Former* ORS 475.992(4)(f) (2001), *renumbered as* ORS 475.864(3) (2005); ORS 133.235(7). However, he also knew that possession of less than one ounce of marijuana within 1,000 feet of a school is a Class C misdemeanor, for which an arrest is authorized. *Former* ORS 475.999(2)(b) (2001), *renumbered as* ORS 475.864(4) (2005). Because he

knew that defendant was parked approximately 500 feet from a building housing a Head Start program, and because he believed that Head Start was a school for purposes of *former* ORS 475.999, he arrested defendant for possession of less than one ounce of marijuana within 1,000 feet of a school. Kienlen also believed that defendant might have been within 1,000 feet of St. Mary's Academy, which he also believed to be a school, but because he believed that the arrest was justified by the proximity to the Head Start building, he did not measure the distance.

After defendant stepped out of his car, Kienlen conducted a search. On defendant's person, Kienlen found a small zippered bag containing various drugs and drug paraphernalia. In defendant's car, Kienlen discovered bindles of methamphetamine, a glass marijuana pipe, two scales, instructions on how to convert grams to ounces, and other drug paraphernalia.

Before trial, defendant moved to suppress all of the evidence on two grounds. First, defendant argued that he was unlawfully stopped, and therefore the can and all other evidence that flowed from the stop was unlawfully seized. Second, defendant argued that, even if the can was admissible because it resulted from a lawful stop and a lawful consent search, all of the other evidence that flowed from his arrest should be suppressed because his arrest was unlawful. That is so, defendant argues, because the arrest was based on Kienlen's belief that Head Start was a school, that defendant was within 1,000 feet of it, and that therefore defendant could be arrested even though he possessed less than an ounce of marijuana. According to defendant, Head Start is *not* a school, so Kienlen lacked probable cause to believe that defendant had committed any offense for which he could be arrested. The trial court rejected defendant's arguments,[1] and defendant renews them on appeal.

---

[1] The court explicitly found that Head Start was a school, but it did not explicitly rule on defendant's argument that all of the evidence was the fruit of an illegal stop. That implicit ruling could have been based on the court's legal conclusion that, on the facts it found, the stop itself was lawful, or on the legal conclusion that, if the stop was illegal, the evidence was nonetheless admissible. Both of those rationales are legal conclusions that we review for legal error. *Hall*, 339 Or at 10.

■ Because it is dispositive, we begin with defendant's argument based on the asserted illegality of the stop and the consequent inadmissibility of the evidence against him. The state concedes that a stop occurred when Miller took defendant's driver's license away from him in order to conduct a warrant check. We agree. *See Hall*, 339 Or at 19 (stop occurred when officer "took [the] defendant's identification card and radioed the police dispatch for a warrant check"). The state further concedes, and we agree, that the stop was unlawful. That is because, under Article I, section 9, of the Oregon Constitution, an officer may lawfully stop a person only if the officer has reasonable suspicion that the person has committed a crime.[2] The state goes on to argue, however, that the evidence was nonetheless admissible because it did not *derive from* the illegal stop. We disagree.

■ ■ "[T]he aim of the Oregon exclusionary rule is to restore a defendant to the same position as if 'the government's officers had stayed within the law.'" *Hall*, 339 Or at 24 (citing *State v. Davis*, 295 Or 227, 234, 666 P2d 802 (1983)). The critical inquiry, therefore, is whether the state obtained the evidence that a defendant seeks to suppress as a result of a violation of the defendant's rights under Article I, section 9. *Id.* That does not mean, however, that evidence will be suppressed merely because it would not have been obtained "but for" unlawful police conduct. *Id.* at 25. Even if a defendant establishes that causal relationship, the evidence nonetheless will be admissible under Article I, section 9, if the state can show that either:

"(1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of defendant's rights under Article I, section 9, has such a tenuous factual link to

[2] Because this case involves application of the exclusionary rule, we conduct the constitutional analysis without first exhausting the statutory analysis. A statutory violation alone does not support exclusion of relevant and otherwise admissible evidence unless required by the United States or Oregon constitution. ORS 136.432. Because the statutory and constitutional analyses are "substantially the same," *Hall*, 339 Or at 16, the statutory analysis is not significant.

the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence."

■ *Id.* at 25 (citations omitted). Thus, where, as here, the chain of causation includes consent—that is, where unlawful police conduct precedes consent and consent then leads to discovery of evidence—the evidence need not be suppressed if the state can prove

"that the consent was independent of, or only tenuously related to, any preceding violation of defendant's rights under Article I, section 9. Unless the state is able to make that showing, then the defendant's consent cannot operate to validate a warrantless search because the defendant's consent *itself* derived from a violation of the defendant's rights under the state constitutional provision."

*Id.* at 27-28 (citation omitted; emphasis in original). Although a defendant has the burden of showing a minimal factual nexus between unlawful police conduct and the defendant's consent, the state "has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Id.* at 34-35.

■ The admissibility of evidence following a violation of a defendant's Article I, section 9, rights "is a fact-specific determination that depends upon the nature of the causal connection between the defendant's consent and the preceding violation of the defendant's rights[.]" *Id.* at 28. Factors that are relevant to the factual determination include:

"(1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id.* at 35.

■ The state argues that, under the foregoing principles, the connection between the unlawful stop and the subsequently discovered evidence was so attenuated that the stop cannot be viewed as the "poisonous tree" from which the "fruit" derived. *See Wong Sun v. United States*, 371 US 471, 487-88, 83 S Ct 407, 9 L Ed 2d 441 (1963) (explaining "fruit of

the poisonous tree" doctrine). The state bases its argument on the fact that, by the time Kienlen observed the soft drink can, Miller had returned defendant's license and Kienlen had told defendant that he was free to leave. Those intervening events, according to the state, broke the chain of causation between the unlawful stop and the discovery of the evidence. In light of recent case law, that theory cannot stand.

 A stop cannot be considered to have ended so long as an officer continues to intentionally and significantly restrict a suspect's liberty, or the suspect subjectively believes that his or her liberty is restricted and that belief is objectively reasonable. *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). Although returning a suspect's identification and telling him or her that he or she is free to leave are both factors that may indicate that a stop has ended, they are not dispositive. In *State v. Toevs*, 327 Or 525, 964 P2d 1007 (1998), for example, an officer stopped the defendant for a traffic violation and, after taking the defendant's license, "ran a check" on it, then returned it and told the defendant that "he was free to go." *Id.* at 528-29. Immediately thereafter, however, the officer asked for permission to search the defendant's vehicle. *Id.* at 529. When the defendant refused to authorize a search of his vehicle, a second officer asked the defendant twice if he had any drugs in his vehicle. *Id.* Eventually, the defendant admitted that he had illegal drugs in his vehicle. *Id.* at 529.

On appeal, the Supreme Court, focusing on the requests to search, concluded that the police, through the continuous exercise of authority, continued to detain the defendant after they had said he was free to leave. The court explained:

> "It is true that, when an officer tells a driver that he or she is free to go, that factor certainly can weigh in favor of concluding that a traffic stop indeed had ended. However, our case law demonstrates that, when viewing the totality of the circumstances, an officer's *conduct* after stating that a driver is free to go may *negate* such a statement."

*Id.* at 537 (emphasis in original). Because the defendant was illegally seized at the time he made incriminating statements, the evidence seized as a result of the defendant's

statements was suppressed. *Id.* at 537-38; *see also State v. Dominguez-Martinez*, 321 Or 206, 213-14, 895 P2d 306 (1995) (stop continued after officer told the defendant he was free to leave, but officer continued to lean on the defendant's car).

*Hall* is also instructive. In that case, an officer noticed the defendant look at him and quickly look away, and then look at him several more times. The officer stopped the defendant and asked him for his identification. The officer called dispatch to find out if the defendant had any outstanding warrants. Before receiving a response from dispatch, the officer returned the defendant's identification. The officer then asked the defendant if he was carrying any weapons, knives, or illegal drugs. When the defendant responded that he was not, the officer asked the defendant if he could search him. The defendant consented to the search, and the officer discovered a small vial containing methamphetamine. *Hall*, 339 Or at 10-11.

Even though the officer had returned the defendant's identification before he requested permission to search, the court suppressed the evidence on the ground that the unlawful stop vitiated the defendant's consent. The court relied on "the close temporal proximity between the illegal detention and [the] defendant's consent, and the absence of any intervening circumstances or other circumstances mitigating the effect of that unlawful police conduct." *Hall*, 339 Or at 36.

Thus, in both *Toevs* and this case, an officer told a suspect that he was free to leave, but then immediately followed that statement by asking the suspect for permission to search. The officer intimated that he believed the suspect had engaged in illegal drug activity. Another officer was present. The suspect continued to refuse permission to search, but ultimately inculpated himself (in *Toevs*, with a statement; here, by granting permission to search).

The similarities between this case and *Hall* are also significant. Like the defendant in *Hall*, defendant here was unlawfully stopped by an officer who requested his identification and used that identification to conduct a warrant check. In both cases, the officers returned the defendants' identification. The temporal proximity between the return of

the identification and the request for consent is similar in both cases.

In sum, we conclude that, as in *Toevs* and *Hall*, the state has not carried its burden of showing that the causal nexus between Miller's unlawful stop of defendant, defendant's consent, and the subsequent discovery of the disputed evidence was sufficiently attenuated to allow the conclusion that the evidence was not the fruit of the unlawful act. That conclusion obviates the need to discuss defendant's argument that his arrest was also unlawful.

Reversed and remanded.