Argued and submitted January 15, reversed and remanded March 26, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOHN ELDON HIGHLEY,
*Defendant-Appellant.*

Yamhill County Circuit Court
CR050560; A130716

180 P3d 1230

Ingrid A. MacFarlane argued the cause and filed the brief for appellant.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Rosenblum, Judge, and Carson, Senior Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

Defendant was convicted of possession of a controlled substance, *former* ORS 475.992 (2003), and appeals his conviction, assigning error to the trial court's denial of his motion to suppress evidence. Defendant also raises an evidentiary issue in a supplemental assignment of error. As explained below, we conclude that defendant was stopped unlawfully and that the evidence that he sought to suppress was gained as a result of that unlawful stop. Accordingly, we reverse and remand on that basis and do not reach defendant's supplemental assignment of error.

■ On review of the denial of a motion to suppress, we are bound by the trial court's factual findings if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Officer Desmond of the McMinnville Police Department observed a car being driven by a man he knew to have a suspended license. The car pulled into the parking lot of an apartment complex, and Desmond followed. All three occupants of the car got out, and Desmond spoke with the driver while the two passengers—defendant and Sears—walked to a nearby apartment. Desmond intended to issue the driver a citation, and he also checked the driver's probationary status. While Desmond was still occupied with the driver, defendant and Sears returned from the apartment (where apparently nobody had answered the door) to the car.

Desmond was aware that both the driver and defendant had been involved in drug activity in the past. Desmond explained that he was checking the driver's probationary status because "most probationers have a clause in their probation that they're not to hang out with other, what is referred to in their probation, [as] other druggers or other drug associates. And, based on the circumstances, he was associating with people that I believe were other drug associates." Desmond also was aware that several people known to him to be involved in drug activity had resided in the apartment where defendant and Sears had knocked on the door. When defendant returned to the car, and while Desmond was waiting for dispatch personnel to contact him

about the driver's probationary status, Desmond asked defendant if he was on probation. Defendant replied that he was not. Because Desmond doubted defendant's veracity about whether he was on probation, he requested defendant's identification, wrote down information obtained from his driver's license, and returned the license. Desmond retained defendant's identification for approximately 30 seconds to a minute. Desmond then returned to his car, ran a check, and "was surprised to learn" that defendant was not on probation. (Desmond also requested Sears's license, wrote down information, and checked his probationary status at the same time.) Desmond may have told defendant that he had verified that defendant was not on probation.

Desmond then spoke with Sears and obtained consent to search him. While Desmond was searching Sears, a second officer, Fessler, arrived and acted "as a cover officer." At that point, defendant was standing by the open trunk of the car. Desmond then asked for permission to search defendant. Defendant replied that he would empty his pockets. Defendant pulled a container out of his pocket. Desmond asked defendant if he would open the container, and defendant carefully extracted some jewelry from it, without allowing Desmond to see what remained in the container. Defendant returned the container to his pocket and moved his hand around in the pocket in a way that made Desmond suspect that defendant was emptying something from the container. Fessler was under the impression that defendant may have been trying to conceal something from his pocket in the car's trunk. Desmond asked if he could look at the container. Defendant pulled the container from his pocket and concealed something from the container in his hand before showing Desmond the container, which was empty. Fessler then grabbed defendant's hand, saw what appeared to be a portion of a baggie in it, and ordered defendant to drop it. After a short struggle, defendant dropped a baggie that was later determined to contain methamphetamine.

Desmond testified at the suppression hearing that, at the point when defendant had returned to the car from knocking on the apartment door, he believed that he had reasonable suspicion to stop defendant, based on defendant's drug history and Desmond's awareness that the apartment

was associated with drug activity. He further testified that he asked for consent to search defendant because he "believed that there was a good possibility that he would have a controlled substance in his possession." Fessler testified that, at the point when he grabbed defendant's hand, he believed that defendant was in possession of drugs or drug packaging materials. He testified that defendant was not free to leave at that point.

The trial court concluded that, given Desmond's knowledge of defendant's criminal history and the fact that defendant had gone to the apartment, Desmond had reasonable suspicion that defendant was involved in criminal activity, and thus had a sufficient basis for asking defendant for his identification. The trial court further concluded that, although the taking of defendant's identification constituted a stop, after Desmond had returned defendant's identification to him, defendant was free to go, and then voluntarily consented to a search. Finally, the court concluded that, when Fessler saw what he believed to be a baggie in defendant's hand, "under the circumstances it was reasonable to believe that it contained contraband," and because it was in plain view, "the officers were justified in seizing what was from his hand."

On appeal, defendant challenges virtually every aspect of the court's conclusions regarding the encounter. More particularly, defendant argues that there was no reasonable suspicion before Desmond asked for defendant's identification, the stop did not end when Desmond returned the identification, the consent was not valid because it turned on the exploitation of the prior illegal stop, and in any event, the court erred in ultimately concluding that the item forced from defendant's hand during the search was in plain view.

The state responds that defendant did not adequately preserve a number of his arguments, including whether the police exploited a prior illegality to obtain defendant's consent to search. After review of the record, we conclude that the issues we address below were adequately preserved. Although it is true that some of the challenged conclusions stemmed from the prosecutor's advancement of various bases for upholding the search, *i.e.*, that the police did

not exploit the prior illegality, and that the seizure of the baggie was justified because it was in plain view, those issues were fairly before the trial court, and hence defendant is entitled to raise them on appeal.[1]

The state also makes a preliminary argument that, contrary to the trial court's explicit conclusion otherwise, defendant was not stopped when Desmond requested his identification and ran a check to determine his probation status. In particular, the state contends that *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), is materially distinguishable from the present case.

 For purposes of Article I, section 9, of the Oregon Constitution, a stop occurs when a police-citizen encounter goes beyond a mere conversation that involves no restraint on liberty, and the officer temporarily restrains the citizen's liberty. Such a stop requires reasonable suspicion of the citizen's criminal activity. *State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991). A determination of whether a defendant has been stopped or seized involves a fact-specific inquiry into the totality of the circumstances surrounding the encounter to determine whether the officer has intentionally and significantly interfered with the defendant's liberty, or whether the defendant, in an objectively reasonable manner, believes that his or her liberty has been restricted. *Id.* at 408-10.

██ When an officer is issuing a citation to the driver of a car, passengers in the car may be stopped in the physical sense but are not necessarily seized in the constitutional sense, although a " 'further exercise of coercive authority over the passengers' by officers 'may, in certain circumstances, constitute a seizure.' " *State v. Thompkin*, 341 Or 368, 377, 143 P3d 530 (2006) (quoting *State v. Amaya*, 336 Or 616, 631, 89 P3d 1163 (2004)). In *Thompkin*, an officer asked for the defendant passenger's identification and retained it for less

---

[1] In particular, we note that the prosecutor specifically addressed the potential applicability of *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), and defense counsel referred to what occurred after the allegedly unlawful stop as "the fruit of that tree that shouldn't have been climbed." We believe that the trial court understood that rather colorful reference to be a reference to exploitation of an illegality, and hence had the opportunity to rule on that issue, although it ultimately did not do so, given its conclusions about reasonable suspicion and plain view.

than five minutes to perform a records check, while a second officer remained beside the car, asking questions of the defendant. The court concluded that "we find it doubtful that a reasonable person in defendant's position would think that he or she was free to leave at a time when that person was the investigatory subject of a pending warrant check and was being questioned about illegal activity." 341 Or at 378-79; *see also State v. Esmino*, 204 Or App 425, 129 P3d 787 (2006) (where an officer told a passenger that she was not free to leave until he had finished investigation of car's driver, "that amounted to an unlawful stop, which the officer then exploited in asking for consent to search"); *State v. Mastin*, 203 Or App 366, 124 P3d 1275 (2005), *adhered to on recons*, 205 Or App 528, 134 P3d 1052 (2006) (after observing traffic infraction, officer who directed driver and passenger to get back into car unlawfully stopped passenger).

In numerous other cases both before and after *Hall*, Oregon appellate courts have concluded that an officer's action in requesting a defendant's identification and running a records check was a stop for purposes of Article I, section 9. *See State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984) (where officer retained identification while running a radio check and obtained information from the defendant that he later used to arrest the defendant, the derivative evidence was suppressed); *State v. Warner*, 284 Or 147, 585 P2d 681 (1978) (officer who "look[ed] at" the defendant's identification and asked the defendant to accompany him to his police car so he could run a warrants check stopped the defendant); *State v. Brown*, 209 Or App 699, 149 P3d 294 (2006) (requesting a defendant's identification and performing a warrant check constituted an unlawful stop; returning identification and telling the defendant he was free to go did not break the causal nexus between illegality and subsequent discovery of evidence); *State v. Cochran*, 206 Or App 686, 690, 138 P3d 864 (2006) (officer "unlawfully stopped defendant when he obtained defendant's identification and ran a warrant check without reasonable suspicion"); *State v. Benfit*, 205 Or App 180, 134 P3d 171 (2006) (where officer asked for and obtained passenger's identification for a warrant check, subsequent consent to search was obtained through exploitation of unlawful stop); *State v. Holcomb*, 202 Or App 73, 121 P3d 13,

*adh'd to as modified on recons*, 203 Or App 35, 125 P3d 22 (2005) ("[T]aking a suspect's identification and calling dispatch to conduct a warrant check constitutes a stop.").

The state maintains that *Hall* (and presumably our numerous cases cited above following *Hall*) are materially different from the present case. As explained below, we conclude that the differences in the facts here are not significant enough to lead to a contrary conclusion.

We begin with a review of *Hall*. In that case, the defendant was stopped by a police officer, Deese, who asked for the defendant's identification and ran a warrant check. Deese returned the identification before receiving information from dispatch personnel and began inquiring about weapons and seeking permission to search the defendant. After receiving such permission, Deese located a glass vial during a pat-down search, opened it, and discovered a controlled substance. *Id.* at 10-11. The Supreme Court began its analysis by noting that neither probable cause nor reasonable suspicion supported a stop, and thus the only question was whether the trial court had correctly concluded that the defendant had not been stopped. The court concluded that the defendant had been stopped:

"In this case, Deese's initial actions of stopping his vehicle next to defendant and then gesturing for defendant to approach him did not intrude upon defendant's liberty of movement, because, even if Deese inconvenienced defendant, his actions did not constitute a show of authority involving conduct 'significantly beyond that accepted in ordinary social intercourse.' [*State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991).] When Deese took defendant's identification card and radioed the police dispatch for a warrant check, however, the consensual nature of that encounter dissipated, and the encounter evolved from a 'mere conversation' encounter into a restraint upon defendant's liberty of movement. It is true that * * * Deese promptly returned defendant's identification card. Nevertheless, when Deese did so, defendant was cognizant that Deese was investigating whether defendant was the subject of any outstanding warrants. Although the state insists to the contrary, we find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant

check. We further observe that, in this case, Deese did nothing to dispel what would have been an objectively reasonable belief that defendant was restrained from leaving until Deese had received the results of the warrant check. Instead, immediately upon returning defendant's identification card, Deese questioned defendant about whether defendant was carrying any weapons, knives, or illegal drugs, and he asked defendant for consent to search defendant's person."

*Id.* at 19.

The state argues that *Hall* is distinguishable because its holding is, in the state's view, "expressly based upon the defendant's knowledge that he was the subject of a pending investigation." Here, the state argues, no evidence supports a conclusion that defendant knew that he was the subject of an investigation, despite the fact that the officer took defendant's identification, wrote down defendant's license number, then returned to the patrol car to radio the dispatcher. The state argues that, under the totality of the circumstances, "there is no evidence that defendant knew that he was the subject of a records request, and there is no other evidence from which a reasonable person would have felt unable to leave." Moreover, the state notes that, because Desmond had not concluded his stop of the driver, the driver remained Desmond's primary focus and thus defendant was not the "investigatory subject" as was the defendant in *Hall.* *Id.*

First, we disagree that a reasonable person whose identification information has been written down by a police officer who has just inquired about the person's probationary status would not understand that he or she was the subject of an investigation. Given that defendant was a passenger rather than the driver of the car and thus not the subject of the traffic violation investigation, and further, that the officer had just inquired about defendant's probationary status, a reasonable person in defendant's position would believe that the officer wrote down the identifying information and then immediately returned to his car with that information in order to run some type of records check.

■ That Desmond retained defendant's identification only for a short time is not dispositive. *State v. Rider*, 216 Or App 308, 172, P3d 274 (2007), is instructive in that regard. There, police entered a motel room without reasonable suspicion and asked the occupants for their names, dates of birth, and addresses but did not ask them to produce any formal identification. An officer wrote down their identification information in a notebook and asked another officer to perform a warrant check. The state argued that the defendant had not been stopped because the officer "never told defendant that he was not free to leave or that he was under suspicion of criminal activity, and did not take from defendant any formal piece of identification." *Id.* at 313. We rejected that argument, noting that, as in *Hall*, a reasonable person would not think he or she was free to leave under such circumstances. *See also Brown*, 209 Or App at 706-08 (although officer had returned defendant's identification and told him that he was free to leave, officer immediately followed up by asking for permission to search, and fruits of search must be suppressed). In short, a *retention* of a suspect's identification, or the length of retention of a suspect's identification, is not the touchstone of whether a stop has occurred. Rather, the question is whether, under the totality of the circumstances, the suspect reasonably believes that he or she is under investigation and is not free to leave. An officer's actions in checking identification, temporarily taking identification, writing down identifying information, and calling in information to a dispatcher all are logically relevant to that inquiry.

As to the state's argument that the driver, not defendant, was the primary target of Desmond's investigation, the point is not well taken. We do not believe that *Hall* suggests that an analysis of a stop hinges on how many suspects are stopped or under investigation. Certainly, in none of the numerous cases cited above concerning passengers in cars that had been stopped for traffic violations did we suggest that an officer's attention to issuing a traffic citation to a driver was significant in determining whether the passenger also had been stopped. *See* 219 Or App at 105-06. That Desmond was simultaneously investigating defendant, Sears, and the driver adds little or nothing to the totality of the circumstances analysis. As was undoubtedly the case in

*Rider,* multiple identification checks can result in multiple stops. Knowledge that someone else also has been stopped does not mean that a reasonable person whose identification also has been requested by an officer should conclude that the officer's investigatory interest is exclusively in that other person.

On these facts, it may be inferred under the totality of the circumstances that (a) defendant understood that Desmond was investigating him when he sought defendant's identification and continued to investigate him through the time that the drugs were discovered, (b) defendant did not believe that he was free to leave, and (c) defendant's belief was objectively reasonable. The trial court correctly concluded that, under *Hall,* the request for defendant's identification, closely followed by the check of defendant's probationary status, and the request for consent to search defendant, constituted a stop.

As noted, the trial court concluded that the stop was justified by reasonable suspicion of criminal activity. Defendant contends that it was not, and the state concedes that point. We accept that concession: the record in this case reflects no more than that Desmond had generalized knowledge that defendant and the driver had a criminal history relating to drugs and was seen knocking at the door of an apartment where people known for drug activities had lived at some point. *See generally State v. Valdez,* 277 Or 621, 629, 561 P2d 1006 (1977) (reasonable suspicion requires an officer to be able to point to specific and articulable facts, which give rise to the inference that criminal activity is afoot). Desmond did not have reasonable suspicion that criminal activity was afoot when he stopped defendant.

■■ In sum, defendant was stopped without reasonable suspicion. That was an unlawful stop under Article I, section 9, of the Oregon Constitution. Whether the unlawful stop was ongoing at the time when the drugs were found is not dispositive of whether defendant is entitled to suppression. Under *Hall,* even if a defendant has established a "minimal factual nexus" between evidence sought to be suppressed and unlawful police conduct,

"the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that the unlawful police conduct cannot be viewed properly as the source of that evidence."

339 Or at 25 (citations omitted).

The state argues, first, that defendant failed to establish the preliminary minimal factual nexus between the seizure of the methamphetamine and Desmond's prior unlawful stop of defendant. The state argues that the "temporal proximity between the unlawful stop and the consent was relatively long." We are unsure what the state means by "relatively long." Neither officer testified in great detail about the timing of the stop, but what little is in the record on this point indicates that Desmond first approached the car at "approximately 8:30 a.m." Within "about a minute or two" of the stop, defendant and Sears had gone to the apartment, then returned to the car. According to Desmond, he asked defendant for his identification "sometime within the next couple of minutes." Shortly after Desmond had requested defendant's identification and checked his probationary status—at which point defendant was illegally stopped—Fessler arrived. Fessler testified that he arrived at 8:33 a.m. When Fessler arrived, Desmond was searching Sears, after which he immediately sought consent to search defendant. That is, the illegality occurred shortly before 8:33 a.m., and the consent to search was obtained very soon thereafter. We conclude that there was no significant temporal break between the illegality and the consent. We also conclude that defendant established the requisite minimal factual nexus between the illegality and the seizure of the evidence sought to be suppressed.

The state also argues that there was a "tenuous factual link," *Hall*, 339 Or at 25, between the unlawful police conduct and the evidence because, after Desmond asked for defendant's identification, he returned it, ran a record check, then performed a search of the other passenger before returning his attention to defendant.[2] Under *Hall*, the state may demonstrate a break in the causal connection in light of

"(1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct."

*Id.* at 35.

■ Here, as noted, we have rejected the argument that there was no close temporal proximity between the unlawful conduct and the consent. As to "intervening circumstances," we do not think that an officer's search of another passenger *who also had been stopped without reasonable suspicion at the same time as defendant* is the type of intervening circumstance that the court had in mind as severing the causal connection between an initial illegality and a later consent. *Cf. Thompkin*, 341 Or at 380 (giving as an example of an intervening circumstances "the provision of *Miranda* warnings"). Finally, there is no indication in the record that either officer told defendant that he was free to leave at any point or that he had a right to refuse consent to a search. In fact, the record does not even establish whether Desmond ever told defendant that he had verified that defendant was not on probation. *Cf. Brown*, 209 Or App at 706 ("Although returning a suspect's identification and telling him or her that he or she is free to leave are both factors that may indicate that a stop has ended, they are not dispositive.").

In sum, defendant was stopped illegally when Desmond took his identification, wrote down identifying data, and conducted a check of his probationary status. Defendant's subsequent consent to a search that eventually

---

[2] The state makes no arguments concerning inevitable discovery or independent source.

led to the seizure of methamphetamine has a factual nexus to the prior illegality, and intervening circumstances did not sever the causal connection between the illegality and the seizure of the evidence.

Reversed and remanded.