Argued and submitted November 25, 2008, affirmed April 1, 2009

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# LARRY JOSEPH COHAN,
*Defendant-Appellant.*

Clatsop County Circuit Court
051394; A132850

204 P3d 816

Harrison Latto argued the cause and filed the brief for appellant.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Riggs, Senior Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant appeals his conviction for possession of a controlled substance, *former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005), arguing that the trial court erred in denying his motion to suppress evidence obtained after a police officer, Hansen, approached defendant and asked for his identification. That request ultimately led to a consent search, which revealed drugs. As explained below, we conclude that the trial court correctly denied defendant's motion to suppress. Accordingly, we affirm.

We state the facts consistently with the trial court's factual findings and its decision denying defendant's motion to suppress. *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007). Although we are bound by the trial court's findings of historical fact if constitutionally sufficient evidence in the record supports them, we assess independently whether those findings support the trial court's legal conclusion. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

Hansen observed defendant's truck parked by a curb with its hazard lights on. By the time Hansen had turned his car around to go back and check on defendant, defendant was driving away. Hansen followed, without activating his lights. Hansen did not intend to stop defendant's truck, because he had no suspicion that any crime or violation had occurred. Hansen observed defendant stop the truck and again put on his hazard lights. Hansen pulled in behind defendant, but still did not activate his lights. Hansen was concerned that defendant might be having vehicle or medical problems. Defendant walked to Hansen's car and asked if he was in trouble. Hansen told defendant that he was not in trouble and that Hansen just wanted to know what was going on. Defendant explained that he was going from house to house, asking for permission to pick flowers, which he would later sell. Hansen then asked defendant if he had any identification. Defendant said yes and walked to his truck to get it. Hansen accompanied him, stating that defendant was not under arrest. Defendant then got his identification from the truck. At that point, according to his testimony, Hansen had no reasonable suspicion that defendant "had done anything

wrong." Hansen immediately noticed that the identification was an Oregon identification card, not a driver's license.

Hansen then ran a check of defendant's identification and discovered that defendant's driving privileges had been suspended. He also checked the identification of the passenger in defendant's truck and discovered that her driving privileges also had been suspended. Hansen asked defendant about methamphetamine use, and defendant responded that he had not used methamphetamine for several years, but Hansen believed that defendant's answer was deceptive. At that point, Hansen intended to cite defendant for driving while suspended, impound defendant's truck, and let defendant go.

Officer Randall arrived at the scene, and Hansen informed him that he suspected defendant of methamphetamine use. Randall began speaking with defendant while Hansen wrote the citation. Defendant asked Randall if he had a phone that defendant could use. Randall told him that he had a cell phone in his car and that defendant could use it, but Randall first needed to know if defendant had any weapons in his possession. Defendant said he did not, and Randall said that defendant could not come to the car with him to use the phone until Randall made sure that defendant was unarmed. Randall then patted defendant down and felt something in a pants pocket that felt like a cigarette box, which he pulled out. Randall asked defendant what it was, and defendant replied that it was a box of cigarettes. Randall asked if he could open it to determine if there were weapons inside, and defendant told him to "go ahead." Randall found paper towels and plastic bags inside the box and asked defendant about them. Defendant replied that it was methamphetamine. He also told Randall that he had a methamphetamine pipe in his pocket. Randall seized the pipe as well. A field test confirmed that the substance was methamphetamine. Defendant was subsequently arrested for possession of a controlled substance.

Defendant argued in his motion to suppress, and reiterates on appeal, that the evidence described above should be suppressed because it was derived from an unlawful stop of defendant. Defendant's argument is

straightforward. He argues that Hansen had no reasonable suspicion to stop him when Hansen asked for and obtained his identification; as a result of asking for and obtaining defendant's identification, Hansen developed a reasonable suspicion that defendant had been driving while suspended, and the discovery of the evidence occurred as a result of the officers' further interactions with defendant after Hansen had developed reasonable suspicion. Thus, defendant argues, under *State v. Hall*, 339 Or 7, 115 P2d 908 (2005), the evidence was obtained as a result of an unlawful stop, and the discovery of the evidence was not attenuated in any way from the illegality.

The state's response similarly is straightforward. The state argues that the trial court correctly concluded that defendant had not been stopped at the point that Hansen observed defendant's identification card, and therefore no illegality preceded Hansen's development of reasonable suspicion that defendant had been driving while suspended.

This case, as both parties understand, is controlled by *Hall* and its progeny. The facts of this case, however, present an interesting variation that we have not previously addressed.

Under *State v. Holmes*, 311 Or 400, 407-10, 813 P2d 28 (1991), there are three categories of encounters between police officers and citizens. The first is "mere conversation," which encompasses consensual interactions between police officers and citizens that require no justification. The second category, temporary restraints on liberty for investigatory purposes, are "seizures" under Article I, section 9, of the Oregon Constitution that must be justified by a reasonable suspicion of criminal activity. The third category consists of arrests, which also are "seizures" under Article I, section 9, and must be justified by probable cause. As described in *Holmes*, a person is "seized" for purposes of Article I, section 9, when either (1) a police officer intentionally and significantly interferes with a person's liberty of movement, or (2) a person believes that his or her liberty of movement has been so restricted and such a belief is objectively reasonable under the circumstances. *Id.* at 410. A determination of whether or when a defendant has been seized for purposes of

Article I, section 9, involves a fact-specific inquiry into the totality of the circumstances surrounding the encounter. *Id.* at 408-10.

In *Hall*, as in this case, a police officer approached the defendant without reasonable suspicion of any crime and requested identification; the encounter ultimately led to a consent search and the discovery of drugs. *Hall*, 339 Or at 10. The trial court denied suppression on the ground that the defendant had not been stopped. The Supreme Court disagreed:

> "In this case, [Officer] Deese's initial actions of stopping his vehicle next to defendant and then gesturing for defendant to approach him did not intrude upon defendant's liberty of movement, because, even if Deese inconvenienced defendant, his actions did not constitute a show of authority involving conduct 'significantly beyond that accepted in ordinary social intercourse.' *Holmes*, 311 Or at 410. When Deese took defendant's identification card and radioed the police dispatch for a warrant check, however, the consensual nature of that encounter dissipated, and the encounter evolved from a 'mere conversation' encounter into a restraint upon defendant's liberty of movement. It is true that * * * Deese promptly returned defendant's identification card. Nevertheless, when Deese did so, defendant was cognizant that Deese was investigating whether defendant was the subject of any outstanding warrants. Although the state insists to the contrary, we find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check. We further observe that, in this case, Deese did nothing to dispel what would have been an objectively reasonable belief that defendant was restrained from leaving until Deese had received the results of the warrant check. Instead, immediately upon returning defendant's identification card, Deese questioned defendant about whether defendant was carrying any weapons, knives, or illegal drugs, and he asked defendant for consent to search defendant's person."

*Hall*, 339 Or at 19. *See also State v. Thompkin*, 341 Or 368, 378-79, 143 P3d 530 (2006) ("[W]e find it doubtful that a reasonable person in defendant's position would think that he or she was free to leave at a time when that person was the

investigatory subject of a pending warrant check and was being questioned about illegal activity.").

In cases following *Hall*, we have grappled with the question of when "mere conversation" becomes a stop. In *State v. Rider*, 216 Or App 308, 172 P3d 274 (2007), *rev dismissed as improvidently allowed*, 345 Or 595 (2008), police received consent to enter a motel room where the defendant was sitting. One of the officers asked the defendant for his name, date of birth, and address. The defendant provided the information, which the officer wrote in his notebook. The officer handed the notebook to another officer and asked her to perform a warrant check. *Id.* at 310-11. While the warrant check was underway, the officer sought and received permission to search the defendant. *Id.* at 311. We rejected the state's argument that no stop occurred because the officer had not retained the defendant's identification. We concluded that, when the officer "ordered the warrant check, the encounter evolved into a restraint on defendant's liberty." *Id.* at 314. Similarly, in *State v. Highley*, 219 Or App 100, 180 P3d 1230 (2008), an officer approached the defendant without reasonable suspicion of a crime, briefly retained his identification while writing down pertinent information, and then ran a check to verify the defendant's probationary status. *Id.* at 102-03. After doing so, the officer asked the defendant for permission to search and ultimately discovered drugs. *Id.* at 103. In rejecting the state's argument that no stop had occurred, we held that the length of time that identification is retained is

> "not the touchstone of whether a stop has occurred. Rather, the question is whether, under the totality of the circumstances, the suspect reasonably believes that he or she is under investigation and is not free to leave. An officer's actions in checking identification, temporarily taking identification, writing down identifying information, and calling in information to a dispatcher all are logically relevant to that inquiry."

*Id.* at 109. In that case, we held that a stop had occurred. *Accord State v. Strader*, 224 Or App 38, 43, 197 P3d 40 (2008) (a stop occurred when an officer, lacking reasonable suspicion, approached the defendant, asked for identification, and used it to run a warrant check); *State v. Ayles*, 220 Or App

606, 188 P3d 378, *rev allowed*, 345 Or 460 (2008) (same); *State v. Atkin*, 190 Or App 387, 78 P3d 1259 (2003), *rev den*, 339 Or 230 (2005) (same).

Defendant asserts that he was stopped unlawfully when Hansen asked for, then took possession of, his identification. At this point, our standard of review of the trial court's decision becomes crucial. The question concerning the timing of the stop was fully explored in the trial court. Hansen's testimony indicated that, as soon as he saw that defendant's identification card was an Oregon identification card rather than a driver's license, he developed a belief that defendant had been driving without a valid license. In reaching its conclusion that no unlawful stop had occurred, the trial court stated:

"[Hansen] then reaches the point where he asks for the I.D., and in my notes he asks for I.D., the defendant indicated he did back at the truck, and at this point the officer testifies he told the defendant he was not under arrest, and you might split hairs over stops and arrests, but he's giving him an affirmative that he's not in trouble at this point. There's nothing to indicate he's stopped.

"So here—so then he asks for the I.D. card, and I think there's a huge distinction between a case of pulling out a driver's license, and then taking it and learning something from the identification that's on that card * * * versus a person pulling out a distinct looking different card, and the card itself is what triggers the reasonable suspicion because the guy's driving a vehicle, and this is not an ODL. * * *

"To me it's a gross difference between those two. It's not the information on the card, it's the fact that what was presented was something that shouldn't have been presented—or not by itself presented by someone driving a vehicle.

"So I think given the totality of what was going on out there that Officer Hansen merely asking for I.D. was not out of line.

"Seeing this card then come—it had to have come first from [defendant]. It * * * *had to have been in [defendant's] hand when Hansen first saw it*, bingo, *it's not a driver's*

*license*, so what's going on here, so thereby creating the [reasonable] suspicion."

(Emphasis added.)

Given the trial court's explicit finding quoted above, which is supported by evidence in the record, the question presented here is not precisely as defendant has framed it. Rather, the question is whether a defendant is unlawfully stopped at the point when he or she is showing identification to a police officer at the officer's request, but the officer has not yet retained the identification.

Contrary to defendant's suggestion, the above-described case law has not decided that issue, much less decided it in defendant's favor. In fact, we have specifically reserved that question. *See State v. Holcomb*, 203 Or App 35, 37, 125 P3d 22 (2005) ("this case does not present the issue whether, or in what circumstances, 'mere obtaining' of identification can effect a stop"). To analyze that question, we return to the basics of the inquiry as spelled out in *Hall*. As an initial matter, the court in *Hall* analyzed the stop question in terms of a *Holmes* type-two analysis—does a person believe that his or her liberty has been restricted and, if so, is such a belief objectively reasonable under the circumstances? 311 Or at 410. In examining the totality of the circumstances existing in *Hall*, the court zeroed in on when the officer "took defendant's identification *and radioed the police dispatch for a warrant check*." 339 Or at 19 (emphasis added). The court went on to note that, although the officer promptly returned the identification, the defendant was cognizant that the officer was checking for warrants and that the court found it "difficult to posit that a reasonable person would believe that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check." *Id.* Similarly, in *Highley*, we listed the factors that were relevant to the totality of the circumstances inquiry as the "officer's actions in checking identification, temporarily taking identification, writing down identifying information, and calling in information to a dispatcher[.]" 219 Or App at 109.

In this case, unlike in any of the cases described above, the officer developed reasonable suspicion justifying a stop *before* he had taken defendant's identification, written

anything down, or called in to check for warrants.[1] In fact, given the trial court's finding above, it was not Hansen's taking of the card nor his visual inspection of the information on the card but his recognition of what the card was, while the card was still in defendant's hand, that gave him reasonable suspicion that defendant had been driving without a valid license. Given the analysis set out in *Hall* and the cases following it, we are unable to agree with defendant that an unlawful stop occurred either when Hansen asked defendant for identification, or at the point at which Hansen was able to see that defendant's identification was an Oregon identification card. In *Hall*, the court's conclusion that a *Holmes* type-two stop had been effected was based on the court's conclusion that the defendant there was aware that the officer was checking for outstanding warrants and that a reasonable person would not have felt free to leave under the circumstances. *Hall*, 339 Or at 19. Similarly, in *Rider* and *Highley*, the key aspect of the totality of the circumstances inquiry was that a reasonable person in the defendant's position would not have felt free to leave given his awareness that he was the subject of a pending warrant check. Here, by contrast, the officer developed reasonable suspicion that formed the basis for a lawful stop *before* he took defendant's identification to perform a warrant check. That is, at the crucial point when a reasonable person in defendant's position could have felt that he was not free to leave because he was the subject of a pending investigation, the officer had reasonable suspicion to conduct that investigation. We emphasize that our conclusion is based on our evaluation of the totality of the circumstances present in this case, where, most pertinently, the officer was not investigating a crime when he observed defendant's identification and, in fact, had told defendant repeatedly that he was not in trouble or under arrest before the identification was produced. The trial court correctly concluded that the stop of defendant was lawful.

Affirmed.

---

[1] Defendant concedes that, at the point Hansen recognized the identification as an Oregon identification card rather than a driver's license, Hansen had reasonable suspicion that defendant had committed an offense.