Submitted on remand from the Oregon Supreme Court March 22, reversed and remanded April 27, 2011

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GLENN CHARLES PARKER,
*Defendant-Appellant.*

Multnomah County Circuit Court
0606-47424; A134163

255 P3d 624

Peter Gartlan, Chief Defender, and Emily Schoonmaker, Deputy Public Defender, Legal Services Division, Office of Public Defense Services, for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, for respondent.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

This case is on remand from the Oregon Supreme Court, which vacated our prior decision, *State v. Parker*, 225 Or App 610, 202 P3d 205 (*Parker I*), *adh'd to as modified on recons*, 227 Or App 413, 206 P3d 259 (2009) (*Parker II*), and remanded for reconsideration in light of *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010) (*Ashbaugh II*). *State v. Parker*, 349 Or 663, 249 P3d 1281 (2011) (*Parker III*). In *Parker I*, we vacated the trial court's denial of defendant's motion to suppress evidence found during the search of defendant's person and remanded the case to the trial court to determine whether "defendant subjectively believed that the officers had significantly restricted his freedom of movement." 225 Or App at 616. Our holding in that regard was predicated on our decision in *State v. Ashbaugh*, 225 Or App 16, 200 P3d 149 (2008) (*Ashbaugh I*), which the Supreme Court reversed in *Ashbaugh II*. The issue on remand is whether, in light of *Ashbaugh II*, the encounter between defendant and the officers constituted a seizure under Article I, section 9, of the Oregon Constitution.[1] As explained below, we conclude that it did. Accordingly, we reverse and remand.

With two amplifications noted below, we take the material facts and a description of the procedural history of this case from our decision in *Parker I*, in which we noted that "[t]he trial court expressly found both the police officers' and the defendant's accounts of the facts to be 'accurate, and a fair recitation of what occurred.'" 225 Or App at 612.

"Consistently with that finding, the salient facts here are as follows: On May 23, 2006, defendant was a passenger in a pickup truck stopped by Portland Police Officers Cioeta and Boman for expired license plate tags. Boman asked the driver and the other passenger for their identification and obtained their information. Cioeta asked defendant if he had any outstanding warrants; defendant replied that he did not. Cioeta then asked for defendant's identification, wrote down defendant's information,[2] returned the

---

[1] As described below, 242 Or App at 391, the state does not dispute that the officer acted without reasonable suspicion or that defendant's consent to search was the unattenuated product of any unlawful seizure. Accordingly, the only issue in this case is whether defendant was unlawfully seized.

[2] In particular, Cioeta asked defendant for his name and date of birth.

identification, and then immediately returned to the police vehicle.

"The officers ran all the occupants' information and checked them for warrants. In the meantime, at least one additional police vehicle arrived on the scene. Boman then asked the driver and another passenger to get out of the truck. The driver was cited for driving while suspended. Boman conducted a patdown search of the other passenger, informed him he was under arrest for an outstanding warrant, and placed him in custody. Cioeta then approached defendant and asked him to get out of the truck. Cioeta asked defendant if he had any weapons; defendant denied that he did.[3] Cioeta then asked for permission to search defendant, and defendant consented. Cioeta conducted a patdown search of defendant and retrieved a switchblade knife from defendant's pants pocket. Defendant was arrested and subsequently charged with carrying a concealed weapon.

"Before trial, defendant moved to suppress the evidence. The trial court denied that motion, concluding that 'regardless of anything that happened before, the consent was freely given and was voluntary.' Following a stipulated facts trial, the court convicted defendant of carrying a concealed weapon, ORS 166.240(1)."

*Id.* at 612-13.

As we explained in *Parker I*, the only issue on appeal was whether the encounter between defendant and the officers was a seizure under Article I, section 9:

"On appeal, defendant assigns error to the trial court's denial of his motion to suppress. Defendant contends that he was unlawfully seized unsupported by reasonable suspicion and that the subsequent inculpatory physical evidence was obtained by exploitation of that unlawful seizure in violation of Article I, section 9. The state's sole response on appeal is that the encounter between defendant and the officer did not constitute a stop. The state argues that Cioeta did not stop defendant when he asked defendant for his identification because the record does not disclose that defendant was aware that he was the subject of an inquiry.

---

[3] At no time during the encounter did Cioeta tell defendant that he was free to leave.

"The state does not dispute that, on this record, Cioeta acted without reasonable suspicion or that, under the analysis of *State v. Hall*, 339 Or 7, 34-35, 115 P3d 908 (2005), defendant's consent to the search was sufficiently causally related to the officer's conduct that the former was the 'exploited' product of the latter. *See id.* (after a defendant presents a minimal factual nexus between a defendant's consent to search and a prior, unlawful seizure, the state has the burden to prove that such consent was independent of, or only tenuously related to, the prior unlawful seizure)."

225 Or App at 613.

Our analysis and disposition of that issue was framed by reference to the construct that we had adopted in *Ashbaugh I*, in which we concluded that "whether the encounter between the officer and defendant [rose] to the level of a *Holmes* type (b) stop"[4] implicated "conjunctive subjective and objective components—*viz.*, the defendant subjectively believed that he or she was significantly restrained *and* that belief was objectively reasonable." *Parker I*, 225 Or App at 614 (emphasis in original). Ultimately, relying on our decision in *State v. Highley*, 219 Or App 100, 180 P3d 1230 (2008), *rev allowed*, 350 Or 130 (2011), we concluded that "a reasonable person in defendant's situation could understand that he or she was the subject of an investigation." *Parker I*, 225 Or App at 616. Accordingly, that conclusion necessitated a remand for the trial court "to address, and render findings, as to whether, before Cioeta elicited defendant's consent to search, defendant *subjectively* believed that the officers had significantly restricted his freedom of movement." *Id.* (emphasis added).

In *Ashbaugh II*, the Supreme Court reversed our decision in *Ashbaugh I*. In *Ashbaugh II*, the Supreme Court "abandon[ed] forthrightly the subjective component of that

---

[4] Our reference to a "*Holmes* type (b) stop" derives from the Supreme Court's decision in *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), in which the court held that a person is "seized" for purposes of Article I, section 9,

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

part of the *Holmes* part (b) test" and explained the proper inquiry for determining whether a person has been seized as follows:

> "A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

349 Or at 316 (emphasis in original). As the court indicated, the guiding principle in determining whether an encounter is a constitutionally significant seizure is whether the officer has manifested a "show of authority" that restricts an individual's "freedom of movement." *Id.* at 317.

Given that repudiation of *Ashbaugh I*, on which our initial decision was predicated, it is patent that we erred in our original disposition, *viz.*, a remand for the trial court to make findings concerning defendant's subjective belief as to whether his freedom of movement had been restricted. *Parker I*, 225 Or App at 616. Accordingly, we must determine whether the encounter between defendant and the officers constituted a seizure under the principles explained in *Ashbaugh II*.

More specifically, the issue is whether defendant was seized, and therefore stopped, when officer Cioeta (1) asked defendant if he had any warrants, (2) requested defendant's identification, (3) wrote down defendant's name and date of birth, and (4) then immediately returned to his vehicle and ran a check to determine whether defendant was the subject of any warrants. In resolving that issue, our decisions in *Highley* and *State v. Radtke*, 242 Or App 234, 255 P3d 543 (2011), are highly instructive.

In *Highley*, which antedated *Ashbaugh I* and was not predicated on our bifurcated construct there, a police officer asked the defendant, who had been a passenger in a vehicle, whether he was on probation. 219 Or App at 102-03.

Thereafter, the officer requested the defendant's identification, wrote down the defendant's information from the defendant's driver's license, returned the license, and then immediately walked back to his police vehicle and "ran a check." *Id.* at 103. In rejecting the state's argument that there was "no evidence support[ing] a conclusion that defendant knew that he was the subject of an investigation," we explained:

> "Given that defendant was a passenger rather than the driver of the car and thus not the subject of the traffic violation investigation, and further, that the officer had just inquired about defendant's probationary status, a reasonable person in defendant's position would believe that the officer wrote down the identifying information and then immediately returned to his car with that information in order to run some type of records check."

*Id.* at 108. Ultimately, we concluded that, in the totality of the circumstances, the defendant understood that he was under investigation and was not free to leave and that such an understanding was objectively reasonable. *See Hall*, 339 Or at 19 ("[W]e find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check.").

We reached a similar conclusion in *Radtke*, which we decided after the Supreme Court vacated and remanded our original decision in that case for reconsideration in light of *Ashbaugh II*. In *Radtke*, "without suspicion that [the defendant] was involved in criminal activity, the officer asked for and received her name and date of birth, wrote that information in a notebook, asked her if she was carrying anything illegal, and, when she said that she was not, asked for and received consent to search her." 242 Or App at 236. However, unlike in *Highley*, the officer "did not 'run' that information to determine whether there was some reason to detain [the defendant]." *Radtke*, 242 Or App at 238.

We reasoned in *Radtke* that "taking a person's identification for the purpose of checking on the person's status is one way in which a police officer can show authority that, in combination with other circumstances, can convey to the person whose identification has been obtained that he or she is

not free to leave." *Id*. at 239-40. Ultimately, applying the principles explained in *Ashbaugh II*, we concluded that, under the circumstances,

> "[a] reasonable inference from [the] sequence of events is that [the officer] took [the] defendant's name and date of birth for the purpose of running a check on her, and the reason that he had not done so in no way indicated that he was not going to—in other words, that the investigatory process had commenced and was ongoing up to the point of arrest."

*Id*. at 240. Several circumstances bolstered that inference, including that, "in addition to taking her information, [the officer] also questioned [the] defendant about illegal activity, albeit in a calm and nonconfrontational voice." *Id*.[5]

Here, the officer (1) asked defendant, a passenger in a stopped vehicle, if he had any warrants; (2) requested defendant's identification; (3) wrote down defendant's name and date of birth; and (4) then immediately returned to his vehicle and ran a check to determine whether defendant was the subject of any warrants. At no point did the officer indicate that defendant was free to leave. Under those circumstances, which are materially indistinguishable from those in *Highley*, we conclude, as we did in *Radtke*, that a reasonable person would conclude that he or she was the subject of an investigation and not free to leave. Accordingly, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

---

[5] *Cf. State v. Lay*, 242 Or App 38, 45, 252 P3d 850 (2011) (concluding that "requesting [the] defendant's license and ordering a warrant check" within the defendant's earshot "initiated a stop" and that, where the officer returned the license almost immediately but did nothing conclusive to indicate that the warrant check had come back clear, "a reasonable person would have concluded that he remained the subject of a criminal investigation").