Argued and submitted July 31, 2008, affirmed February 11, petition for review
denied June 17, 2009 (346 Or 361)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHRISTOPHER ROBERT BRETCHES,
*Defendant-Appellant.*

Jackson County Circuit Court
060721FE; A134144

202 P3d 883

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Karla Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Carson, Senior Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant appeals his conviction for possession of a precursor substance, ORS 475.967, arguing that the trial court erred in denying his motion to suppress evidence. As explained below, we conclude that, under the analysis of *State v. Toevs*, 327 Or 525, 964 P2d 1007 (1998), the trial court correctly denied suppression. Accordingly, we affirm.

The evidence at the suppression hearing consisted solely of the testimony of Jarred Barney, a patrol officer with the Central Point Police Department. Barney testified that he observed several traffic infractions and then pulled over defendant's truck. Barney, who noticed that defendant was nervous, informed him that he was not going to ticket him for the traffic infractions, but that he was concerned that defendant might be driving under the influence of intoxicants. Accordingly, Barney asked defendant to step out of the truck and perform field sobriety tests (FSTs). Barney also took defendant's identification to run a check on him and then returned the identification.

The FSTs took approximately five minutes, after which Barney concluded that defendant had not been driving under the influence. Barney informed defendant that he had passed the FSTs and was free to leave.

After being told that he was free to leave, defendant, according to Barney, "just stood there and we continued to talk." Barney asked defendant if he had anything illegal on his person. Defendant replied that he had "a little bit of marijuana in his coat pocket." Barney asked defendant if he could search defendant and his truck for drugs or drug paraphernalia. Defendant, whom Barney described as "extremely cooperative," told Barney to go ahead and search. A search of defendant's coat revealed less than an ounce of marijuana. Barney then called for backup officers, who arrived before the truck was searched. Defendant waited at the curb with his dog while the search of the truck was conducted. That search of the truck led to the discovery of the evidence pertinent to defendant's conviction.

Before trial, defendant filed a motion to suppress the evidence obtained as a result of the search. Defendant

argued, based on *State v. Holmes*, 311 Or 400, 813 P2d 28 (1991), that, even if reasonable suspicion justified Barney's detention of defendant throughout the FSTs, that reasonable suspicion had dissipated by the time Barney sought permission to search—and, thus, the evidence should be suppressed because defendant's consent occurred in the course of an unlawful stop. At the hearing on the motion, the state, which bore the burden of demonstrating that the warrantless search was lawful, did not argue that there was evidence from which the court could infer that defendant subjectively felt free to leave. Rather, the state argued that defendant's subjective perception was not dispositive here and that the sole issue before the court was whether a reasonable person could have felt that he was being detained at the time defendant consented to the search.

The trial court denied defendant's motion to suppress without making specific factual findings. Here, given that the facts are undisputed and that the state did not dispute defendant's subjective belief, the only question is whether the trial court correctly determined that a reasonable person in defendant's position could not have believed that he was being detained at the point when he consented to the search. *See generally State v. Ashbaugh*, 225 Or App 16, 200 P3d 149 (2008).

An encounter between a law enforcement officer and a person is a seizure under Article I, section 9, of the Oregon Constitution

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

*Holmes*, 311 Or at 409-10. On appeal, defendant argues that the trial court erroneously concluded that a reasonable person in his circumstance could not have believed that he was being detained. In particular, defendant contends that, under the *Holmes* "type (b) analysis," "a reasonable person in defendant's position could have believed that the officer[ ]

significantly had restricted his liberty or freedom of movement." *Toevs*, 327 Or at 536. In particular, defendant urges us to apply our reasoning from *State v. Hadley*, 146 Or App 166, 172, 932 P2d 1194 (1997), that a traffic stop continues "until the motorist has had a 'real time' opportunity to move on. There must, in other words, be a distinct temporal 'break in the action' between an officer's indication that a motorist is free to go and any unrelated inquiries."

The problem with defendant's suggestion is that *Hadley* did not interpret Article I, section 9, or apply the test from *Holmes*; the analysis there was purely statutory. Moreover, we later specifically disavowed the test set forth in *Hadley* in *State v. Hallmark*, 157 Or App 538, 542, 973 P2d 908 (1998):

> "In * * * *Toevs*, 327 Or [at] 532, * * * however, the Supreme Court addressed 'the proper methodology for determining whether a traffic stop either continued or ended' under ORS 810.410. The court held that the proper methodology consists of a two-part inquiry: First, did the defendant subjectively believe that he was under continued detention by the police? Second, if so, was the defendant's subjective belief objectively reasonable? *Id.* at 535. The first question is one of fact to be determined by the trial court, the second is one subject to the independent assessment of the appellate court. *Id.* That two-part methodology supersedes the test that we previously described in *Hadley* * * *."[1]

Thus, the inquiry here, properly framed, is whether, under the totality of the circumstances, a reasonable person in defendant's position could have believed that Barney was restricting his liberty or freedom of movement when they continued to converse after Barney told defendant that he was free to go. Defendant urges that the facts of this case are similar to those in *Toevs* and that we should, consequently, conclude that he was stopped. Although we agree that there are some similarities to *Toevs*, there are also several materially distinguishing differences.

---

[1] *Toevs*, *Hadley*, and *Hallmark*, of course, all were statutory cases. *Toevs*, however, applied the *Holmes* test to the statutory question. *See, e.g., State v. Hall*, 339 Or 7, 16, 115 P3d 908 (2005) (reiterating that test set out in *Holmes* and *Toevs* "is substantially the same").

In *Toevs*, the defendant was lawfully stopped for a traffic infraction. The two officers on the scene, Smith and Solesbee, obtained the defendant's identification and determined that he had a valid driver's license and was on parole. The officers decided not to issue a traffic citation but, because one of the officers had had a previous drug-related encounter with the defendant, they wanted to search the defendant's vehicle. 327 Or at 528-29. At that point, Smith returned the identification and told the defendant that he was free to leave. However, Smith then immediately asked defendant for consent to search the vehicle and the following colloquy and conduct ensued:

> "Defendant asked Smith if Smith was accusing him of anything. Smith responded that he was not accusing defendant, but wondered why defendant would not consent to a search. Smith then asked if he could search both defendant and defendant's vehicle, and asked whether there were any drugs in defendant's vehicle. Defendant responded that he did not have any drugs and, again, did not consent to a search. That conversation, beginning from the time when Smith told defendant that he was free to go, lasted about 30 seconds.
>
> "Solesbee, who had been watching Smith and defendant from his position behind defendant's vehicle, then approached the driver's side of defendant's vehicle and interrupted the conversation between Smith and defendant. Smith stepped back and stopped his questioning. Solesbee asked defendant, in a 'low key' and 'friendly' manner, 'if he had any dope in the vehicle.' Defendant shielded his eyes, lowered his face, and answered '[n]o.' At that point, Solesbee observed that defendant 'appeared very fidgety, extremely nervous acting, excited in his body movements but not excited in his speech. His pupils were extremely dilated.' In Solesbee's training and experience, he believed that defendant might have ingested methamphetamine.
>
> "Solesbee then stated to defendant that defendant would feel better about the situation if he were honest and told Solesbee that he had drugs in his vehicle, if indeed he did. Solesbee asked defendant again if he had any drugs in the vehicle. Defendant responded that '[t]here is a little in the truck.'"

*Id.* at 529.

The Supreme Court determined that, under the circumstances, the defendant had been stopped. The court particularly relied on the following facts:

"First, after telling defendant that he was free to go, Smith immediately asked defendant if he could search the vehicle. He continued to do so, even though defendant did not give consent after the first request. He also asked defendant if defendant possessed any drugs. Second, while Smith was questioning defendant, Solesbee, who had had prior drug-related contact with defendant, was standing outside the patrol vehicle, behind defendant's vehicle on the driver's side. When it became apparent that Smith was unable to obtain defendant's consent to a search, Solesbee also approached defendant and interrupted Smith. Solesbee then asked defendant two more times if he had any drugs in the vehicle."

*Id.* at 536. The court went on to note that

"when an officer tells a driver that he or she is free to go, that factor certainly can weigh in favor of concluding that a traffic stop indeed had ended. However, our case law demonstrates that, when viewing the totality of the circumstances, an officer's conduct after stating that a driver is free to go may negate such a statement."

*Id.* at 537.

Thus, the Supreme Court in *Toevs* considered the lack of a break between telling the defendant he was free to go and the request for consent to be one of the factors that weighed in favor of finding that a stop had occurred. But it also found significant the presence of *two* officers stationed outside of the defendant's car, both of whom continued to seek consent to search after the defendant had refused to consent.

Here, we agree with defendant that the lack of a break between when Barney told him he was free to leave and the continuation of the conversation militates in favor of a determination that the encounter here satisfied the objective component of the *Holmes* "type (b)" determination. However, the remaining factors listed by the court in *Toevs* decisively cut against that conclusion.

Here, unlike in *Toevs*, where the officers essentially engaged in "tag-team" tactics, *id.* at 536, Barney was the only officer present at the time that the traffic stop ended. *Cf. State v. Brown*, 209 Or App 699, 149 P3d 294 (2006) (where officer approached vehicle without reasonable suspicion, and several officers gathered around the defendant's car and made multiple requests to search, court concluded that the defendant was stopped despite the fact that one officer had told him he was free to go). Moreover—and at least as significantly—Barney, unlike the officers in *Toevs*, did not, after the end of the stop, immediately and repeatedly seek consent to search from a motorist who was otherwise in a position to drive away. That is, at the time Barney and defendant continued their conversation, defendant was not in his vehicle. Rather, after Barney told him he was free to leave, defendant "just stood there" and the two of them "continued to talk," in a conversational, nonconfrontational manner, with Barney ultimately, and successfully, requesting consent to search. Finally, and tellingly, unlike the defendant in *Toevs*, *see* 327 Or at 536, defendant was not subjected to multiple requests to search, never refused consent, and, when asked, never denied that he had drugs on him.

We observe, finally, that Barney did not engage in the sort of physical conduct that we and the Supreme Court have pointed to as unlawfully effecting or extending a traffic stop. *See, e.g., State v. Dominguez-Martinez*, 321 Or 206, 895 P2d 306 (1995) (under statutory analysis, defendant was stopped while officer continued to lean on car door after informing defendant he was free to leave); *State v. Wood*, 188 Or App 89, 69 P3d 1263 (2003) (officer telling a defendant he was free to go after issuance of citation was effectively negated by officer's physical conduct in preventing him from leaving).

In short, this is not a case in which the "officer's conduct after stating that a driver is free to go may negate such a statement." *Toevs*, 327 Or at 537. Accordingly, we conclude that the circumstances here did not satisfy the objective component of the *Holmes* "type (b)" analysis, and that the trial court did not err in denying defendant's motion to suppress.

Affirmed.