No. 57　　　　November 21, 2013　　　　459

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review*,

*v.*

JOHN ELDON HIGHLEY,
*Respondent on Review.*

(CC CR050560; CA A130716; SC S056079)

En Banc

On review from the Court of Appeals.*

Argued and submitted June 8, 2011; resubmitted January 7, 2013.

Anna Marie Joyce, Assistant Attorney General, Salem, argued the cause for petitioner on review. On the brief were John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Jeff J. Payne, Assistant Attorney General.

Ingrid A. MacFarlane, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause for respondent on review. With her on the brief was Peter Gartlan, Chief Defender

LINDER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

Brewer, J., concurred in the judgment and filed and opinion.

Walters, J., dissented and filed an opinion in which Baldwin, J., joined.

_____
* Appeal from Yamhill County Circuit Court, John L. Collins, Judge. 219 Or App 100, 180 P3d 1230 (2008).

**LINDER, J.**

This is the third of three cases that we decide today in which we examine whether a police request and verification of identification is a seizure under Article I, section 9, of the Oregon Constitution.[1] As we will explain, our analysis of this case is largely controlled by our decision today in *State v. Backstrand*, 354 Or 392, 412-13, ___ P3d ___ (2013), in which we hold that an officer's mere request for and verification of identification is not a seizure. Contrary to the Court of Appeals' resolution of this case, *State v. Highley*, 219 Or App 100, 110, 180 P3d 1230 (2008), we conclude that the officer did not seize defendant by asking for his identification and checking defendant's probationary status based on that identification or by asking defendant for consent to search. We, therefore, reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

## BACKGROUND

Officer Desmond is a member of the Yamhill County Interagency Narcotics Team. For about two and a half years before this case arose, he had been a member of that team and involved in drug investigations in and around the McMinnville area. On this particular occasion, Desmond was on patrol at 8:30 in the morning when he saw Williamson, someone he knew from past drug arrests and investigations, drive a car into a parking lot between two apartment complexes in McMinnville. Desmond knew that Williamson's license was suspended, so he followed the car into the parking lot. Williamson parked in an angled parking space near one of the apartment complexes; Desmond parked in the middle of the parking lot some distance away (and so that his patrol car was not blocking Williamson's car from leaving) without activating his overhead lights. Desmond saw Williamson and two passengers—defendant and Sears—get out of the car. Desmond got out of his car and "said something to get [Williamson's] attention," knowing that Williamson would recognize Desmond if Desmond said something to him.

---

[1] The other two cases are *State v. Backstrand*, 354 Or 392, ___ P3d ___ (2013), and *State v. Anderson*, 354 Or 440, ___ P3d ___ (2013). We allowed review in all three cases after having held them in abeyance pending our decision in *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010).

In addition to knowing Williamson, Desmond also recognized defendant from past contacts and arrests involving drug activities, and he knew defendant by name. At that point, Desmond did not say anything to defendant or the other passenger because Desmond's only purpose in pulling into the parking lot was to talk to Williamson. As Desmond and Williamson began talking, defendant and Sears walked away and went to the door of one of the apartments.

Less than a minute later, defendant and Sears returned to Williamson's car, apparently because no one answered the door at the apartment. When they returned, the two were, in Desmond's words, "just milling around" the car. Desmond, meanwhile, was still dealing with Williamson, who Desmond thought was on probation. Desmond had called dispatch to verify Williamson's license status. Desmond also called the probation department to check whether Williamson's probation officer had any "interest" in the fact that Williamson was in the area of apartments known to have drug activity and was in the company of people known to be involved with drugs and who had gone to an apartment with a history of drug activity, all of which likely violated the conditions of Williamson's probation.

While Desmond waited for a response from the probation officer, and while defendant and Sears were "kind of just hanging out at the car," Desmond spoke briefly with defendant and asked him if he was "still on probation." Defendant told Desmond that he was not. Desmond then asked both defendant and Sears whether they had their identification on them and whether Desmond could look at that identification. Both defendant and Sears handed Desmond their licenses. Defendant took them, wrote down the license numbers, and handed the licenses back. Desmond estimated that he had the licenses for "at the most" between 30 seconds and a minute before returning them to defendant and Sears.

In defendant's case, Desmond wanted to confirm that defendant was not on probation and could have done that with defendant's name alone, which Desmond already knew. But Desmond nevertheless asked for the identification because dispatch can check the information more quickly

with information from the license. As soon as Desmond handed the licenses back to defendant and Sears, he walked over to his patrol vehicle, leaving defendant and Sears by Williamson's car. Desmond called dispatch and confirmed that, as defendant had told him, defendant was no longer on probation. While Desmond was in his patrol car, defendant, Williamson, and Sears "were just standing around the vehicle, as they were before, kind of just walking around[.]"

After making the call to dispatch, Desmond returned to where the three were standing. Desmond asked Sears if he would consent to be searched. Sears agreed. Desmond was interested in only a "non-intrusive" search and asked Sears if he would empty his pockets, which "he did willingly." During that search, a second officer, Officer Fessler arrived. Fessler was there only as a "cover officer" and simply stood by, observing, without otherwise assisting Desmond. The only item of interest that Sears took from his pockets was a black film canister. Desmond asked Sears if he could look inside it, and Sears, in response, opened the canister for Desmond. It appeared to have just water in it. Sears told Desmond that he had found the canister on the ground "on the way to the apartment complex." Desmond knew that intravenous drug users often carry water with them, but there was nothing illegal about the canister and what it contained, and Desmond was not concerned with it. While Desmond examined what Sears had in his pockets, Desmond did not pay close attention to defendant or to what he was doing.

When Desmond was done examining the film canister and searching Sears's pockets, Desmond returned briefly to his patrol car. He then walked back to Williamson's car. Defendant, by then, had moved to the trunk area of the car and was either looking in the open trunk or getting something out of it. Desmond thought that defendant was getting something from the trunk because he realized—and Desmond himself may have told defendant—that the car was going to be towed. Willamson and Sears, meanwhile, remained on the passenger's side towards the front of the car, where they were—to use Fessler's term—"chitchatting" with Fessler.

Desmond approached defendant and told defendant that he was right about his probation status. Desmond then asked defendant for consent to search him. Defendant responded by telling Desmond that he would empty his pockets for him. Defendant first showed Desmond what was in his right pocket; nothing in it was of interest to Desmond. Defendant then removed a small, oval-shaped, plastic container from his left pocket. Desmond asked defendant what was in it, and defendant said "some diamonds." Desmond asked if defendant would open it. Rather than simply show Desmond the contents, defendant responded by opening the container "just slightly" and cupping it in his hand, so that some but not all of what was inside could fall out. What fell out was mostly some "odd jewelry-type items" and what could have been diamonds (Desmond could not tell if they were real). Defendant appeared to be concealing something else in the container by not letting it fall out. Defendant then put the container back in his left pocket.

Desmond asked defendant if he would let Desmond look in the container and in his left pocket, where defendant had put the container. Defendant agreed, and reached into the pocket. He did not take the container out immediately, but instead moved his hand around in the pocket. When Desmond asked him what he was doing, defendant said that he wanted to make sure there was no more jewelry in the container. When Desmond asked again if he could see the container, defendant pulled it out of his pocket. While keeping Desmond to his left, defendant turned away from Desmond and seemed to transfer something from his left hand to his right while keeping the container in his left hand. Defendant then opened and showed the container to Desmond, proving that it was empty.

Fessler during that time was standing on defendant's right side, about five or six feet away, near the rear quarter panel of the car. Although he had been conversing with Sears and Williamson and only occasionally glancing at Desmond and defendant, Fessler fixed his attention on defendant when he noticed some of the odd movements that defendant was making. Fessler in particular saw defendant "blade" the right side of his body away from Desmond,

blocking Desmond's view of defendant's right side. Fessler then saw defendant put his right hand in his right pocket and pull it out in a fist. As defendant did that, Fessler noticed "a little small clear plastic [b]aggie *** sticking out the bottom" of defendant's fist. Fessler suspected that the baggie contained illegal drugs and asked defendant what was in his hand. Defendant started to move away from Fessler, who responded by grabbing defendant's right wrist. After a struggle, defendant finally opened his hand, which led to the officers' discovery of two plastic baggies containing methamphetamine.

As stated, defendant moved to suppress all the evidence discovered as a result of the search, arguing that he had been unlawfully seized and that his consent to search was a product of the unlawful seizure. The state responded that Desmond's conduct in asking defendant for identification and running a check on his probationary status after giving the license back to defendant was not a stop and, thus, not a seizure. If, however, it was a stop, the state contended that Desmond had reasonably suspected that defendant, under the circumstances, might be in possession of drugs. The state also argued that, in any event, the stop ended when Desmond returned the license, completed the check on defendant's probation, and then "broke contact" with defendant to search Sears pursuant to Sears's consent. At the point that Desmond returned his attention to defendant, the state urged, defendant gave voluntary consent to search, and the officers acquired cause to detain defendant once Fessler saw what reasonably appeared to be packaging for drugs concealed in defendant's hand.

In response, defense counsel did not dispute that defendant's consent to search was voluntary or that the officers acquired sufficient cause to seize defendant when Fessler saw the plastic baggie concealed in defendant's hand. Defendant argued only that, before defendant gave his consent to search, Desmond had unlawfully detained him by asking him for his identification and taking possession of that license, however briefly, and by asking for consent to search. Defense counsel urged that "there never should have been any inquiry of [defendant]. And this matter should have been over when the contact with the driver was over."

The trial court denied the motion to suppress on two theories. First, the trial court concluded that defendant was seized when Desmond obtained his driver's license and wrote down the license information, but that that seizure was justified by reasonable suspicion that defendant was involved in criminal activity related to suspected drug use at the apartment that defendant had approached. The trial court also concluded that, in any event, the seizure ended when Desmond returned defendant's license and walked back to his patrol car. Thus, according to the trial court, the search of defendant's pockets was lawfully based on defendant's consent. Although defendant had not argued to the contrary, the trial court further concluded that, when Fessler saw "what looked like a plastic [b]aggie sticking out of [defendant's] hand or fist[,]" under the circumstances, "it was reasonable to believe that that [b]aggie may contain a controlled substance." That reasonable belief, in turn, provided Fessler with justification for grabbing defendant's wrist and "obtaining [the baggie] from his hand."

On appeal, defendant challenged the denial of his motion, arguing that he was seized unlawfully when Desmond requested, retained, and then ran his license number to check on his probationary status. Defendant also argued that the request for consent to search had amounted to a seizure. Defendant urged that the evidence discovered in the search was the result of "exploitation of the illegal detention" and that his consent to search was not "independent of the illegal detention." The state responded that the records check did not amount to a seizure because there was no evidence that defendant knew that he was the subject of a records request and no other evidence that would have caused a reasonable person to believe that he or she was restrained from leaving. The state argued in the alternative that, even if there had been a seizure, Desmond did not exploit that seizure to gain defendant's consent to search. The state conceded that Desmond had no reasonable suspicion to seize defendant before Fessler observed the plastic baggie in defendant's hand.

The Court of Appeals agreed with defendant that "the request for defendant's identification, closely followed by the check of defendant's probationary status, and the

request for consent to search defendant, constituted a stop." *Highley*, 219 Or App at 110. The court based its decision on cases in which "Oregon appellate courts have concluded that an officer's action in requesting a defendant's identification and running a records check was a stop for purposes of Article I, section 9." *Id*. at 106 (citing cases). The court concluded that "a reasonable person in defendant's position would believe that the officer wrote down the identifying information and then immediately returned to his car with that information in order to run some type of records check." *Id*. at 108. According to the Court of Appeals, that constituted a seizure because a reasonable person in the circumstances would believe "that he or she is under investigation and is not free to leave." *Id*. at 109. The court ultimately concluded that the challenged evidence was obtained as a result of the unlawful seizure and defendant was therefore entitled to suppression. *Id*. at 111-13. On review, the parties largely renew those arguments, focusing on whether defendant was seized at any point in his encounter with Desmond before the drugs were discovered.[2]

## ANALYSIS

As we earlier noted, this case is the third of three decided today in which we examine whether a police request for and verification of identification is a seizure under Article I, section 9. In *Backstrand*, the first of the three cases, we discuss at length the principles that inform that analysis. 354 Or at 398-413. In *Anderson*, the second of the three cases, we summarize those principles from *Backstrand*. 354 Or at 449-52. Our discussion of the legal principles in this case, therefore, is accordingly abbreviated.

As *Backstrand* reaffirms, not every police-citizen encounter rises to the level of a seizure for constitutional purposes. 354 Or at 400. Rather, "law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or

---

[2] As in *Backstrand* and *Anderson*, the state also urges us to further revise the two-part "seizure" test that we recently modified in *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010). As we did in both of those cases, we decline the state's invitation here because this case does not adequately implicate the prong of the test that the state asks us to reconsider. *See Backstrand*, 354 Or at 399 n 8 (declining to reach argument); *Anderson*, 354 Or at 448-49 n 5 (same).

impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful." *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991). An officer seizes a person only if the officer's words, manner, or actions would convey to a reasonable person that the officer is exercising his or her authority to restrict the person's liberty or freedom of movement in a significant way—that is, in a way that exceeds ordinary social boundaries. *Id*. at 409-10. Verbal police inquiries are not, by themselves, seizures. *Backstrand*, 354 Or at 403 (citing propositions from *State v. Rodgers/ Kirkeby*, 347 Or 610, 622, 624, 227 P3d 695 (2010)). And in particular, a request for identification does not, without more, convert an encounter between an officer and a citizen that is not a seizure for constitutional purposes into one that is. *Id*. at 409-10. Nor does an officer's action in verifying a person's identification, without more, convert the encounter into a seizure. *Id*. at 413. As *Backstrand* explains:

> "We see no principled basis for concluding that, when an officer checks the validity of a proffered identity or piece of identification, such an action *per se* conveys to a reasonable person—who is not otherwise restrained and who has willingly tendered the information to the officer—that the officer is now exercising his or her authority to coercively restrain the person's liberty or freedom of movement. To be sure, as we have already discussed, a person tendering identification to an officer may not subjectively feel comfortable refusing the officer's request. Instead, for any number of personal reasons or instincts, the person may be unwilling to decline the officer's request. Those internalized motivations and feelings are not the test for whether there is a seizure under Article I, section 9. A person who turns over identification to a law enforcement officer reasonably would expect that the officer will take steps to verify its validity. For the officer to do so does not objectively convey an exercise of the officer's authority to restrain the person's liberty or freedom of movement. The circumstance is akin to when a person gives valid consent to search. Part and parcel with giving consent is a reasonable person's expectation that he or she will likely either need or want to stand by while the officer performs the search. The person who waits while a consent *search* is completed is not thereby *seized* for purposes of Article I, section 9. So, too, with a person who, in

a noncoercive setting, gives an officer his or her identification for the officer's examination. The fact that the officer conducts that examination is not, in and of itself, a basis to conclude that the otherwise noncoercive encounter has become a *coercive* restraint on the person's liberty."

*Id*. at 412-13 (emphasis in original) (footnote omitted).

That brings us to this case. Here, defendant does not assert that he was stopped at any point before Desmond asked him for identification. Nor would that contention be availing. Desmond, after parking in the parking lot, called out to Williamson, the driver, and proceeded to talk only to him. While Desmond did that, defendant and Sears were free to go about their activities unrestrained, and they did so. They walked away from where Williamson's car was parked, went to an apartment, and then returned of their own accord. Desmond said nothing to them and did not even pay much attention to them throughout that time.

After defendant and Sears returned, they chose to "mill" around the car, where Desmond remained with Williamson. As they milled around, Desmond asked defendant if he was still on probation; defendant said that he was not. Desmond then asked both Sears and defendant for identification. That request was, as we conclude in *Backstrand* and reaffirm in *Anderson*, a straightforward request for information and cooperation of the kind that this court, since *Holmes*, has continued to affirm police officers may make without implicating Article I, section 9. *Backstrand*, 354 Or at 409-10; *Anderson*, 354 Or at 451. When defendant gave his license to Desmond, and Desmond took possession of it, his choice to cooperate with Desmond's request did not convert the encounter into a seizure for constitutional purposes.

Nor did what happened immediately after that result in a seizure of defendant. Desmond held defendant's and Sears's licenses only briefly—just long enough to write down the license numbers. Within 30 seconds to a minute, at most, Desmond handed the licenses back. The Court of Appeals, in its discussion, declined to consider "the length of retention of a [person's] identification * * * the touchstone" or otherwise dispositive of whether a stop has occurred. *Highley*,

219 Or App at 109. We agree. As we observed in *Backstrand*, a person who decides to cooperate with an officer's request for identification reasonably can expect that the officer will do something with that identification, such as seek to verify the person's identity or status. *See Backstrand*, 354 Or at 412-13 (officer verified validity of license); *State v. Watson*, 353 Or 768, 782, 305 P3d 94 (2013) (verification of status of stopped driver's driving privileges). That the officer either retains the identification for a reasonable time while doing so, or swiftly returns the identification and uses information from it for those purposes, are not actions that transform a noncoercive encounter into one in which the individual's liberty is significantly restrained through an exercise of coercive police authority. *Id*.

Rather than convey a restraint on defendant's liberty, Desmond's actions affirmatively conveyed the opposite. Defendant, until Desmond engaged him, had walked away and returned of his own accord. Desmond, for his part, after writing down the license numbers, turned and walked away, without doing anything that reasonably would convey that defendant was no longer at liberty to leave. Indeed, defendant in fact then went about his own business, going to the trunk of the car, apparently to remove some personal possessions because he knew that the car was to be towed. When Desmond returned to the car after checking defendant's probationary status, Desmond did not engage defendant at all. Instead, he talked to Sears and examined what Sears had in his pockets with Sears's consent and cooperation. Defendant, of his own accord, remained. When Desmond did turn his attention to defendant again, Desmond told defendant that he had confirmed that defendant was not on probation—information that reasonably conveyed that Desmond was not exercising authority over defendant's liberty.

Desmond then asked if defendant would consent to search, and defendant said that he would show Desmond what was in his pockets. What ensued might be best characterized as a game of "cat and mouse," in which defendant voiced his willingness to cooperate and took seemingly cooperative actions, while surreptitiously attempting to conceal the methamphetamine that was in his possession. Desmond's request for consent, and the questions that he

asked defendant during the search (*e.g.*, what defendant was doing with his hand in his pocket when he did not remove the container the second time), were verbal inquiries only. They were not seizures. *See Rodgers/Kirkeby*, 347 Or at 622 (verbal inquiries are not seizures); *Ashbaugh*, 349 Or at 316-17 (defendant not seized when officers asked her if she had anything illegal in purse and requested consent to search purse).[3]

In short, Desmond's actions, considered both individually and in combination, did not seize defendant. In concluding that they did, both the trial court and the Court of Appeals relied principally on our decision in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005). In doing so, however, they misunderstood the holding in *Hall*.

In *Hall*, an officer parked his vehicle next to the defendant as the defendant was walking along a street. The officer motioned for the defendant to approach the officer's vehicle and then got out of his vehicle as the defendant neared. The officer asked to see the defendant's identification. When the defendant handed his identification to the officer, the officer radioed dispatch and requested a warrant check. While awaiting the results of the warrant check, the officer returned the identification and proceeded to question the defendant about whether he was carrying any weapons, knives, or illegal drugs. The defendant responded in the negative. In response, the officer asked the defendant for consent to search his person, and the defendant consented. The search revealed evidence of unlawful drug possession. *Id.* at 10-11.

The court in *Hall* concluded that the encounter began as a noncoercive engagement between the officer and the defendant, but evolved into a seizure in the course of the officer's investigation. The court explained that the officer's

---

[3] Defendant urges that Desmond seized him by continuing to request "consent to a search greater than defendant appeared willing to allow." Any such characterization of the exchange more properly should be presented as a claim that defendant's consent was invalid because Desmond exceeded the scope of the consent that defendant gave. *See generally State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994) (discussing "scope of the consent" cases as separate category of cases involving validity of consent to search). Defendant has never raised such a challenge, and we reject a characterization of the search that implicitly assumes an illegality that defendant has never asserted.

"initial actions of stopping his vehicle next to [the] defendant and then gesturing for [the] defendant to approach him did not intrude upon [the] defendant's liberty of movement[.]" *Id.* at 19. But the court concluded that the nature of the encounter changed when the officer took the defendant's identification and conducted a warrant check. The court acknowledged that the officer promptly returned the defendant's identification, but maintained that, at that point, the defendant was aware that he was the subject of a pending warrant check and, because of that fact, it was "difficult to posit" that a reasonable person would have felt free to leave. *Id.* The court further observed that the officer

> "did nothing to dispel what would have been an objectively reasonable belief that defendant was restrained from leaving until [the officer] had received the results of the warrant check. Instead, immediately upon returning [the] defendant's identification card, [the officer] questioned [the] defendant about whether [the] defendant was carrying any weapons, knives, or illegal drugs, and he asked [the] defendant for consent to search [his] person."

*Id.*

*Hall* should not be understood, as it appears to have been understood by some advocates and by the Court of Appeals, to stand for the proposition that an officer's request for identification and a check of that identification, either to determine its validity or the status of the person who tenders it, is a *per se* stop. *See, e.g.*, *Highley*, 219 Or App at 106 (citing *Hall* for proposition that "an officer's action in requesting a defendant's identification and running a records check [is] a stop for purposes of Article I, section 9").[4] *Hall* was a close case and turned on its specific facts. As *Holmes* observed, because of the diversity of potential police-citizen encounters, determining when an encounter between an officer and a citizen is a seizure for constitutional purposes is necessarily a fact-specific exercise and requires an examination of the totality of the circumstances involved. 311 Or at 408. And more recently, we have acknowledged that, "in practice, the

---

[4] The Court of Appeals also cited *State v. Painter*, 296 Or 422, 676 P2d 309 (1984), and *State v. Warner*, 284 Or 147, 585 P2d 681 (1978), for the same proposition. As our discussion of those cases in *Backstrand* establishes, they, too, are not authority for the *per se* rule that the Court of Appeals applied. *Backstrand*, 354 Or at 410, 412.

line between a 'mere encounter' and something that rises to the level of a 'seizure' does not lend itself to easy demarcation." *State v. Fair*, 353 Or 588, 595, 302 P3d 417 (2013). In *Hall*, none of the officer's actions (hailing defendant, asking for identification, checking that identification, asking about weapons and drugs, asking for consent) individually was sufficient to amount to a stop. In combination, however, the court in *Hall* concluded that those actions crossed over the line and transformed what began as a mere encounter into a stop.

No similar alchemy occurred here. None of Desmond's actions—the request for identification, the check of defendant's probationary status, and the request for consent to search—individually constituted a seizure. Considered in combination, they were simply acts that occurred sequentially. They did not combine to form a whole greater than the sum of their parts. Indeed, other facts affirmatively detract from any conclusion that defendant was stopped. Defendant's initial status while Desmond talked to Williamson was essentially that of a bystander—a bystander who was free to come, go, and move about at will, all of which he did. When Desmond asked for defendant's identification, a reasonable person in the same circumstances would assume that Desmond wanted to verify whether, as defendant said, he was off of probation; when dispatch confirmed that he was, Desmond so advised defendant. Those facts reinforce our conclusion that, under the totality of the circumstances, defendant was not seized by Desmond's actions.

That conclusion resolves this case. The trial court concluded that, during the search, defendant's actions in attempting to conceal the baggie in the palm of his hand, and Fessler's observations of the baggie, gave the officers sufficient cause to grab his wrist and forcefully open it to determine whether he was concealing drugs, as they believed he was. Defendant has never challenged that conclusion. Nor has defendant challenged the voluntariness of the consent that he gave Desmond to examine what was in his pockets. Defendant's claim that Desmond exploited an illegal stop of defendant to obtain his voluntary and otherwise valid consent falls with our conclusion that Desmond did not seize defendant at any point before defendant gave his consent to search.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**BREWER, J.,** concurring in the judgment of the court.

The majority holds that no part of Officer Desmond's interaction with defendant amounted to a seizure—not his request for identification, not his initial request that defendant submit to a search, and not his persistence in the face of defendant's obvious reluctance to reveal the contents of containers in his pockets—and that, in consequence, the question of reasonableness does not arise. My analysis of the interaction is different. First, for the reasons explained in my concurrence today in *State v. Backstrand*, 354 Or 392, 432 ___ P3d ___ (2013), I would conclude that Desmond seized defendant when he requested, examined, and ran defendant's identification without reasonable suspicion or probable cause to believe that defendant had committed a crime, and that, in the absence of any other articulable basis for taking those actions that would pass constitutional muster, those actions were unreasonable for purposes of Article I, section 9, of the Oregon Constitution. Second, I would accept the trial court's determination that the initial seizure ended when Desmond returned defendant's identification to him. Finally, I would confront the question whether an additional seizure occurred when Desmond requested defendant's consent to search his person. Although I think that the correct answer to that question is "yes," I must acknowledge that this court's decision in *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010), likely compels the opposite conclusion. Accordingly, and solely because *Ashbaugh* supports—and perhaps dictates—the outcome that the majority reaches, I concur in the majority's conclusion that there was no unreasonable seizure of defendant for purposes of Article I, section 9. I write separately, however, to express my concerns about that conclusion and its implications.

The first issue to consider is whether defendant was seized when Officer Desmond requested, examined, and ran his identification. The trial court determined that defendant was seized in those circumstances, and I agree. As the

majority notes, Desmond, who had followed the car in which defendant was a passenger, knew defendant by name and recognized him from past arrests involving drug activities. After defendant and his fellow passenger returned from the apartment complex, they were "milling around" the car where Desmond was questioning the driver. While Desmond was waiting for a response to his inquiries of the driver's probation officer, he asked defendant if he was still on probation. When defendant said that he was not on probation, Desmond asked if he could look at defendant's identification. In those circumstances, it would have been apparent to a reasonable person in defendant's position that he was the focus of a police investigation related to a possible probation violation, drug activity, or both, and that he must cooperate until the investigation was completed. Accordingly, I would conclude that Desmond seized defendant by requesting, taking, and running through dispatch defendant's identification.

The next question is when the identification-related seizure ended. The trial court found that that seizure ended when Desmond returned defendant's identification, and there is evidence to support the court's determination. In particular, Desmond returned defendant's identification almost immediately after writing down information contained in it. In addition, Desmond did not tell defendant to wait while he verified defendant's statement that he was not on probation. When Desmond returned to his patrol car with defendant's information, there is no indication that defendant perceived that he was being detained. Instead, defendant moved to a different area—near the trunk of his companion's car—and "milled around." Finally, when Desmond got back out of his car, he engaged the driver of the car, not defendant, in further conversation, and only later came over to defendant's location. Under those circumstances, I would conclude that there is evidence to support the trial court's determination that the initial seizure ended when Desmond returned defendant's identification.

The remaining issue is whether an additional seizure occurred when Desmond engaged defendant in further conversation and, more specifically, requested defendant's consent to search his person. Defendant asserts that he was

seized when, with the support of a cover officer, Desmond asked defendant if he could search his person or, thereafter, when Desmond "persisted in seeking defendant's consent to a search greater than defendant appeared willing to allow." Several recent decisions by this court are pertinent to the resolution of that issue.

*State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010), involved two challenges to consent searches in the context of initially lawful traffic stops. In *Rodgers*, this court considered whether the defendant was seized when an officer questioned him about suspicious containers that the officer had observed in the defendant's car at the end of an otherwise lawful traffic stop. *Id.* at 627. In concluding that the defendant had been seized, the court first observed that police questioning during a traffic stop by itself does not ordinarily implicate Article I, section 9. *Id.* at 622. However, the court held that police questioning that is unrelated to the basis for the stop, when combined with an officer's show of authority, may result in an unauthorized seizure. *Id.* at 624. Under the totality of the circumstances, the court concluded in *Rodgers* that the officers' positions on both sides of the defendant's car "was a sufficient 'show of authority' that, in combination with the unrelated questions concerning the items in the car and the request to search the car, resulted in a significant restriction of [the] defendant's freedom of movement." *Id.* at 627.

Similarly, in *Kirkeby*, the defendant had been lawfully stopped for investigation of a traffic infraction. *Id.* In the course of conducting that investigation, the officer asked the defendant for consent to conduct a pat down and, following the pat down, the officer requested consent to examine each of the items that he had detected in the course of the pat down. *Id.* at 628. Based on the totality of the circumstances, the court concluded that "the deputy's show of authority that accompanied his request that defendant consent to a pat-down and subsequent request that defendant consent to an examination of the contents of defendant's pockets occurred after the point that defendant should have been issued a citation or sent on his way." *Id.*

In resolving the two cases, the court explained that,

"[t]o put the matter another way, constitutionally, Article I, section 9, protects persons and effects from unreasonable searches and seizures by requiring a judicially authorized warrant supported by probable cause authorizing a search or seizure. There are, however, certain limited exceptions to the warrant and probable cause requirements. One such exception permits the police to stop and briefly detain motorists for investigation of noncriminal traffic violations. Police conduct during a noncriminal traffic stop does not further implicate Article I, section 9, so long as the detention is limited and the police conduct is reasonably related to the investigation of the noncriminal traffic violation. However, a police search of an individual or a vehicle during the investigation of a noncriminal traffic violation, without probable cause and either a warrant or an exception to the warrant requirement, violates Article I, section 9. Because police inquiries during a traffic stop are neither searches nor seizures, police inquiries in and of themselves require no justification and do not necessarily implicate Article I, section 9. However, police inquiries unrelated to a traffic violation, when combined with physical restraint or a police show of authority, may result in a restriction of personal freedom that violates Article I, section 9."

347 Or at 624.

As the majority points out, *Rodgers/Kirkeby* involved traffic stops where what amounted to requests to search had occurred after the officers' authority to detain the defendants had ended. In those circumstances, the court concluded that reasonable people in the defendants' positions would have inferred that the underlying stops remained in progress and, thus, would feel constrained to cooperate with the officers' requests. *Id.* at 622-23. From those decisions, a majority of this court has distilled the principle that "verbal inquiries" generally are not searches and seizures although, in the "distinctive context" of both cases, "the verbal inquiries alone continued the seizures." *Backstrand*, 354 Or at 407.

I agree with the majority that it was important to the outcome of those cases that the bases for the stops had

ended when the requests to search were made. That said, in my view, those decisions do not compel the conclusion—on which the majority's reasoning depends—that a police officer's request for consent to search a person is the sort of "verbal inquiry" that, if made civilly and without any other "show of authority," passes for mere conversation in a citizen-police encounter. However, as noted, I acknowledge that this court's subsequent decision in *Ashbaugh* likely does compel that conclusion.

In *Ashbaugh*, two police officers approached the defendant and her husband in a public park, took their identifications, and ran a warrant check on both of them. The warrant check revealed an active restraining order between the defendant and her husband, which led the officers to arrest the husband for violating the order. Then, after returning the defendant's identification to her and leaving her alone for about five minutes while they arrested her husband and placed him in a police car, the officers returned to the defendant's location and, eventually, asked her for consent to search her purse. The defendant consented, and an officer discovered methamphetamine in the purse.

The court in *Ashbaugh* acknowledged that its "efforts to explain what the constitutional term 'seizure' embraces ha[d] not yet succeeded: Our various explanations, from *Holmes* to *Rodgers*/*Kirkeby*, have left questions unanswered." *Ashbaugh*, 349 Or at 310. In attempting to clarify the concept, the court made some progress, but in important respects, it did not finish the job. In particular—and in my view, unfortunately—the court endorsed the fiction that, if made in a civil manner, a request for consent to search a person in the context of an obviously criminal investigation amounts to mere conversation without constitutional significance. In determining whether the officer had made a constitutionally significant show of authority in seeking consent to search the defendant in that case, the court said:

> "[The officer's] request was not accompanied by any physical action that could be construed as threatening or coercive—he did not, for example, position himself and his fellow officer in a way that would suggest to defendant that she was surrounded."

*Ashbaugh*, 349 Or at 317. The court emphasized a trial court finding that the encounter was "relaxed and nonconfrontational," *id.*, and it minimized the effect of the concededly unlawful prior seizure of the defendant arising from the officer's request for and running of her identification, because "those circumstances had ended." *Id.* The court reasoned that

> "the officers had returned defendant's identification to her and left her alone while completing the arrest and transportation of her husband. Thus, while it may have been true that defendant had been unlawfully detained by police some minutes before and had watched a clear show of authority directed at her husband, those circumstances had ended."

*Id.* at 317. Ultimately, the court concluded that, "[a]lthough it is possible to restrict a person's liberty and freedom of movement by purely verbal means," the officer did not do so when he asked the defendant whether she had anything illegal in her purse and if he could search it. *Id.* at 317. Based on the totality of the circumstances existing when the officers asked the defendant for consent to search her purse, the court concluded that a reasonable person would not have believed that his or her liberty or freedom of movement had been intentionally and significantly restricted and, accordingly, the court concluded that the defendant had not been seized. *Id.* at 317-18.[1]

---

[1] In a separate dissent, Justice Walters questioned the majority's failure to address and distinguish several of this court's significant previous decisions, including *State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005), where this court concluded that police had seized the defendant when they took his identification for a warrant check, because a reasonable person in that situation would believe that his or her freedom of movement had been restricted. *Ashbaugh,* 349 Or at 321 (Walters, J., dissenting). To its credit, the majority here has attempted to distinguish *Hall* and other earlier decisions from the circumstances of this case. However, it is in *Ashbaugh* that this court crossed an important line by treating consent search requests like the one here as "mere conversation," a "verbal inquiry," or an insufficient "show of authority" to significantly restrict its subject's freedom of movement. Although it is always possible to highlight factual differences between any two cases, the differences between the circumstances in *Ashbaugh* and those present here are not constitutionally significant to me. I sympathize with the impulse to make such distinctions, but it is unrealistic to expect officers and citizens in the field who must make split second consent requests and decisions, to rely on such shades and subtleties. In my view, we need to recognize *Ashbaugh* for what it stands for, not try to distinguish our way around it.

With respect, I question each of those premises. Even though, as here, the initial seizure in *Ashbaugh* had ended before a second, more fruitful, seizure occurred, the entire interaction between the defendant and the officers in *Ashbaugh* was permeated with the sort of police authority that attends a criminal investigation. There are many circumstances in which police officers should be permitted to inconvenience or even annoy citizens by making "verbal inquiries" or "requests for cooperation" as they conduct investigations of various sorts. Haling passersby to ascertain whether they have witnessed a recent crime is a salient example. However, a line should be drawn where it is apparent from the circumstances that the person being approached is himself or herself the focus of a police investigation. In such circumstances, it is inaccurate to characterize police requests—whether for identification or for consent to search—as mere verbal inquiries. Instead, such requests, however civilly made, ordinarily suggest that the person is suspected of wrongdoing and that he or she must cooperate until the investigation has ended. In fact, that implication is the foundation for most consent searches in which evidence of a crime is found. After all, apart from a sense that the police are in control of the encounter, there is little else to account for a choice that is often certain to lead to the suspect's arrest and prosecution.[2]

That view is shared by many, if not most, commentators who have considered the issue. Professor LaFave has this to say about consent searches in the context of traffic stops in the present era:

---

[2] There are multiple possible explanations, but none suggests that what is going on is truly voluntary. As Professor Whorf puts it:

"There are plausible explanations for the ready acquiescence to search by the 'guilty': 1) the overall coercive nature of the routine traffic stop turned consent search; 2) the technique of catching the motorist off-guard by the quick transition from traffic stop to contraband investigation; 3) the possible belief by consentors that well-concealed contraband will not be found; 4) the possible belief by consentors that if they readily acquiesce, police suspicion will be dispelled resulting in a cursory search or in no search at all; and 5) the likely belief by consentors that, if they refuse consent, police suspicion will be heightened resulting in a forcible search."

Robert H. Whorf, *Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique*, 28 Ohio NU L Rev 1, 22 (2001).

"Yet another technique commonly employed in connection with drug stops disguised as traffic stops is seeking consent to make a search. Usually the officer attempts to get the driver to consent to a search of the vehicle, but sometimes the requested consent will be for search of the person. Requesting consent has apparently become yet another part of the 'routine' of 'routine traffic stops,' and it is thus not surprising that the cases contain acknowledgments by police about the frequency of this tactic. These requests result in affirmative responses in the overwhelming majority of cases. Guilty or innocent, most motorists stopped and asked by police for consent to search their vehicles will expressly give permission to search their vehicles, resulting in thousands upon thousands of motor vehicle searches of innocent travelers each year. This is apparently attributable to the training police have received in the art of acquiring what will pass for consent, plus the fact that many factors often present in this setting produce an affirmative response."[3]

Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich L Rev 1843, 1891 (2004) (emphasis omitted; internal citations and quotation marks omitted).

According to LaFave, the fiction of consent searches in the traffic stop context has taken its toll on constitutional limits:

"[T]he failure of most courts, when dealing with traffic-stop consent searches, to adhere to the [*Terry v. Ohio*, 392 US 1, 19-20, 88 S Ct 1868, 20 L Ed2d 889 (1968)] limits on what constitutes a reasonable temporary detention has produced very distressing results. Consent searches are no longer an occasional event by which a crime suspect may advise the

---

[3] In the words of Professor Whorf:

"The 'right' technique is by now well-established and is likely a frequent subject of law enforcement training in 'drug interdiction.' It goes like this: A police officer stops a vehicle for a routine traffic violation such as speeding; the police officer asks the driver to get out of the vehicle; the police officer chats in a friendly way with the driver and, sometimes, with passengers as well; the police officer issues a warning rather than a citation for the traffic offense; the police officer asks if the vehicle contains anything illegal; and then, right on the heels of the inevitable denial, the police officer asks for permission to search the vehicle."

Whorf, 28 Ohio NU L Rev at 2-3.

police of his or her wishes and for the police to act in reliance on that understanding, but are now a wholesale activity accompanying a great many traffic stops, submitted to by most drivers, guilty or innocent, and resulting in continued interruption of their travels for a substantial period of time while they wait by the roadside as their vehicles are ransacked, a process which beyond question is highly invasive of the dignitary interests of individuals. Certainly the best way to deal with this problem is as in *State v. Fort*, [660 NW2d 415 (Minn 2003)], which involved a traffic stop for speeding and a cracked windshield. The court quite correctly held that the officer's 'consent inquiry \*\*\* went beyond the scope of the traffic stop and was unsupported by any reasonable articulable suspicion,' [*id.* at 419,] meaning the evidence obtained via the consent must be suppressed, without regard to whether the inquiry and subsequent search 'may also have extended the duration of the traffic stop.'"

LaFave, 102 Mich Law Rev at 1892-93 (footnotes omitted).

In the face of mounting concerns about the prevalence of routine consent searches in traffic stops, some state courts have increasingly looked to their own state constitutions to set more meaningful limits on police activity during traffic stops. Some of those courts have interpreted their state constitutions to flatly forbid the police from posing questions or requests that are unrelated to the underlying reason for the traffic stop, unless the questions or requests are supported by particularized reasonable suspicion to believe that the accosted person has committed or is committing some other crime.[4] Another state court has interpreted its constitution to allow officers to engage in some degree of unrelated questioning, even in the absence of articulable suspicion, but not if the officer's questions or requests change the fundamental nature of the stop. *State v. McKinnon-Andrews*, 151 NH 19, 846 A2d 1198, 1203 (2004). And New York has imposed a similar requirement as a matter of state common law. *See People v. Hollman*, 79 NY2d 181, 590 NE2d 204 (1992) (holding that reasonable suspicion was

---

[4] *State v. Washington*, 875 NE2d 278, 282-83 (Ind App 2007*); Fort*, 660 NW2d at 418-19; *State v. Elders*, 192 NJ 224, 927 A2d 1250, 1260-61 (2007); *State v. McClendon*, 350 NC 630, 517 SE2d 128, 132 (1999); *see also State v. Quino*, 74 Haw 161, 840 P2d 358, 363-64 (1992) (applying a similar rule to a non-motor vehicle investigative stop).

required before narcotics officers could approach a passenger in a bus terminal and ask for permission to search the person's bag).

In my view, those courts have struck a better balance than have we in protecting citizens from unwarranted government intrusion. When, in the absence of reasonable suspicion of criminal activity or some other articulable justification, police officers apprehend criminals in the course of a so-called consent search, it is tempting to welcome the result; but we do so at the expense of the liberty interests of all people. It is unsatisfying to reply that law-abiding citizens have nothing to fear from requests for consent to search their persons that are not animated by an articulable justification. They do, if they value their right to be free from unreasonable intrusion. Moreover, the bar for a seizure based on reasonable suspicion that criminal activity is afoot or some other articulable justification is not so high that police are unable to adequately enforce the law, interdict crime, perform statutory caretaking functions, and protect their own safety in the absence of authority to seek consent to conduct groundless searches. *See*, *e.g.*, *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993) ("[I]f a police officer is able to point to specific and articulable facts that give rise to a reasonable inference that a person has committed a crime, the officer has 'reasonable suspicion' and hence may stop the person for investigation.").

Here, defendant was a passenger in a vehicle whose driver was being investigated for suspicion of driving while suspended, but an obviously broader police purpose to uncover evidence of criminal activity animated the encounter. Defendant, a passenger, was briefly seized when Desmond requested, examined, and ran his identification. As discussed, that seizure ended before Desmond next approached defendant. In the meanwhile, defendant was free to leave, but he was apparently waiting—as most passengers would—for Desmond to conclude his business with the other occupants of the vehicle so that they could leave together. After telling defendant that he had verified that defendant was no longer on probation, Desmond nevertheless asked defendant for consent to search his person. By that time, a cover officer

also was "present." In response to the search request, defendant agreed to empty his pockets. From that point forward, the futile "cat and mouse" gambit that the majority recounts ensued, wherein defendant attempted to delay the discovery of the drugs in his pocket while Desmond, politely but persistently, refused to let things go.

In my estimation, Desmond's request to search defendant constituted a seizure under Article I, section 9, because that action, viewed in light of Desmond's previous inquiry concerning defendant's probation status and his request for defendant's identification, communicated to defendant for a second time that he was the focus of an active police investigation and therefore was obligated to cooperate until Desmond concluded his investigation. Irrespective of whether defendant was a motorist or a passenger,[5] such an intrusive and focused inquiry would not be acceptable in an ordinary social interaction. For those reasons, if writing on a clean slate, I would conclude that Desmond's actions in seeking defendant's consent to search his person significantly interfered with defendant's freedom of movement. I would further conclude that an objectively reasonable person in defendant's position would believe that Desmond had done so. Accordingly, I would conclude that Desmond's request for consent to search defendant amounted to a seizure for purposes of Article I, section 9, of the Oregon Constitution.[6] Because there was no articulable justification for the seizure, I also would conclude that it was unlawful.

---

[5] We generally construe the initial detention of passengers in a traffic stop as merely incidental to that of the driver. *See State v. Thompkin*, 341 Or 368, 377, 143 P3d 530 (2006) (holding that a passenger in a lawfully stopped vehicle is not automatically seized within the meaning of Article I, section 9, but a "further exercise of coercive authority over the passengers by officers may, in certain circumstances, constitute a seizure"). It is unnecessary to challenge that assumption here, but I note that there is an emerging appreciation that, as a practical matter, it can be erroneous. *See, e.g.*, Erica Flores, *Comment, "People, Not Places": The Fiction of Consent, the Force of the Public Interest, and the Fallacy of Objectivity in Police Encounters with Passengers During Traffic Stops*, 7 U Pa J Const L 1071, 1080 (2005). The holding in *Thompkin* also likely is inconsistent with United States Supreme Court decisions holding that, for purposes of the Fourth Amendment, a traffic stop entails the seizure of the vehicle's passengers. *See Arizona v. Johnson*, 555 US 323, 129 S Ct 781, 172 L Ed 2d 694 (2009); *Brendlin v. California*, 551 US 249, 127 S Ct 2400, 168 L Ed 2d 132 (2007).

[6] Accordingly, I would not reach defendant's alternative argument that Desmond's ensuing persistent efforts to obtain consent constituted an unlawful seizure.

I hasten to add that I can envision circumstances wherein an officer's request for consent to search a suspect that is unsupported by an articulable justification would not result in an unlawful seizure. If, for example, the officer were to make it clear to a suspect that he or she need not comply with the request and is free to leave, and the officer's actions or actions of other officers on the scene did not convey a different message, then the show of police authority that is otherwise inherent in such a request might be sufficiently dissipated so as to dispel the conclusion that an unlawful seizure had occurred.[7] However, there is no indication in the record that such a disclaimer was made in this case, so there is no occasion to further consider that issue here.

Finally, because the state does not dispute that there was a connection between Desmond's request to search and defendant's consent, I also would conclude that the discovery of the contraband in his possession was the product of an unlawful seizure.[8] However, this court's decision in *Ashbaugh* settles those issues in a different way. Accordingly, based

---

[7] On remand from the United States Supreme Court, the Ohio Supreme Court in *State v. Robinette*, 80 Ohio St 3d 234, 685 NE2d 762, 771 (1997), found that a motorist's consent to search was involuntary under the Ohio Constitution. The court emphasized that it did not adopt a *per se* requirement that all motorists must be informed of their right to leave, but it held under the totality of the circumstances in the case before it, including the officer's failure to so inform the defendant, that the consent was invalid. *Id*.

[8] The attenuation analysis has been especially problematic for this court when it comes to "consent" searches. In *Ashbaugh*, three concurring justices were of the opinion that the defendant's voluntary consent provided an independent basis for affirming the trial court's judgment in that case. *Ashbaugh*, 349 Or at 318-20 (Durham, J., Kistler, J., and Linder, J., concurring). That view was based on the defendant's stipulation that her consent was voluntary. *Id*. at 319. Here, the majority makes a similar, but not identical point, by indicating that defendant has not challenged the voluntariness of his consent. 354 Or at 470-71, 471 n 3). Although that may be true in a narrow sense, in a broader sense, the entire point of defendant's argument is that his consent was invalid because it was the direct product of an unlawful request for consent. In his briefs before this court and the Court of Appeals, defendant repeatedly has made such assertions. That is, defendant does not deny that he said "yes"; instead he asserts that, under the circumstances, "no reasonable person would feel free to refuse their cooperation, thus resulting in the person's seizure, especially considering that the officers neither said nor did anything that would dispel such reasonable belief." Accordingly, I would not hinge any part of the analysis in this case on the premise that defendant has not challenged the voluntariness of his consent.

solely on a proper respect for the principles of *stare decisis*, I respectfully concur in the judgment of the court.

**WALTERS, J.,** dissenting.

I respectfully dissent. For the reasons that I explain today in *State v. Backstrand*, 354 Or 392, 418 ___ P3d ___ (2013) (Walters, J., concurring in the judgment), it is my view that, when an officer asks for and obtains an individual's identification in circumstances in which a reasonable person would believe that he or she is being subjected to a criminal investigation and therefore must stop, respond, and remain until the immediate investigation is complete, the officer effects a seizure under Article I, section 9, of the Oregon Constitution.

In this case, an officer approached defendant, questioned him about whether he was on probation, and obtained and checked his identification. Then the officer approached defendant a second time. The officer confirmed to defendant that defendant was not on probation, but signaled that the officer's investigation was not complete: With another officer present, the officer asked defendant for consent to search and continued to question defendant, focusing his inquiry on the items in defendant's pockets. I agree with Justice Brewer that, when viewed independently, each of those two encounters were seizures under Article I, section 9, of the Oregon Constitution. 354 Or at 474, 484 (Brewer, J., concurring in the judgment of the court).[1]

I also think that it is appropriate to view those events in combination and that, under the "totality of the circumstances" test, the officer seized defendant. In that light, the correct result in this case is determined by this court's decision in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005). This court has not overruled *Hall* and, although there admittedly is some tension between *Hall* and the court's decision in

---

[1] I especially agree with and appreciate Justice Brewer's discussion of the officer's request to search and Justice Brewer's comments about whether such a request must be constitutionally justified or reasonably related to a stop which is itself constitutionally justified. 354 Or at 484-85. In my view, this court has not yet decided those questions. *See State v. Watson*, 353 Or 768, 784 n 18, 305 P3d 94 (2013) (finding it unnecessary to address whether officer's inquiries, including request to search, made during the pendency of a valid seizure implicate Article I, section 9).

*State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010), I do not see that the decision in this case is controlled by *Ashbaugh* and not by *Hall*.

The majority takes the position that, in *Hall*, "none of the officer's actions (hailing defendant, asking for identification, checking that identification, asking about weapons and drugs, asking for consent) individually was sufficient to amount to a stop," but that in combination "those actions crossed over the line and transformed what began as a mere encounter into a stop." 354 Or at 473. The majority then says that no similar "alchemy" occurred here because, considered in combination, the acts in this case "were simply acts that occurred sequentially." *Id*. To my eye, the line the majority draws between "mere" and "more," or between transformative and sequential, is drawn in invisible ink.

In this case, defendant was not a pedestrian or a bystander. Defendant was a passenger in a car who reasonably could not go on his way until the driver of the car was ready and able to leave. *See State v. Thompkin*, 341 Or 368, 378-79, 143 P3d 530 (2006) (passenger in car was seized because, under totality of circumstances, her liberty was restrained). The time period during which the officers conducted their investigation of defendant and the driver was not brief. During part of the time that defendant was questioned, a second "cover" officer was present. The officer who questioned defendant asked him for consent to search and, like the officer in *Hall*, did nothing to dispel the notion that had been created by the officer's request for and check of defendant's identification that defendant was under investigation and not free to leave. *See Hall*, 339 Or at 19 (officer "did nothing to dispel what would have been an objectively reasonable belief that [the] defendant was restrained from leaving"). I can understand how the officer's show of authority in this case was *more* restraining than was the show of authority considered in *Hall*, but I cannot understand why the officer's acts in this case were not at least sufficient to transform the encounter from a conversation into a stop.

The public, the police, and the trial courts deserve greater guidance from this court. "[S]ome advocates" and the Court of Appeals may have been mistaken in understanding

the rule from *Hall* as a *per se* rule that whenever the police request and obtain an individual's identification, they seize the individual. 354 Or at 472. However, the rule that I take from *Hall* is that, when police officers request and obtain an individual's identification in a circumstance in which a reasonable person would believe that he or she is the subject of a criminal investigation, the officers exercise authority that reasonably conveys that the individual must stop, respond, and remain until the investigation is complete, and that the officers thereby effect a seizure. That understanding does not preclude police officers from seizing individuals; it requires only that they have a constitutionally sufficient justification for doing so.

Because the majority holds that Article I, section 9, does not apply to these facts, I respectfully dissent.

Baldwin, J., joins in this dissenting opinion.